**DUNN v. WILSON & CO., Inc.**
No. 1115.

District Court, D. Delaware.
Aug. 25, 1943.

Josiah Marvel, Jr., and James R. Morford, both of Wilmington, Del., for plaintiff.

Hugh M. Morris and Edwin D. Steel, Jr. (of Morris, Steel, Nichols & Arsht), and Aaron Finger (of Richards, Layton & Finger), all of Wilmington, Del., for defendant.

LEAHY, District Judge.

In this case I make the following findings of fact:

1. This suit is brought in the name of Tirzah P. Dunn as plaintiff. She is a resident of St. Louis, Missouri.

2. Wilson & Co., Inc., defendant, is a Delaware corporation.

3. Prior to February 23, 1935, the effective date of the amendment to defendant's Certificate of Incorporation, which is now in question, defendant had outstanding three classes of stock, i. e., 7% Cumulative Preferred, Class A, and Common Stock.

4. The former 7% Preferred Stock was entitled to receive dividends, when and as declared by the board of directors, at the rate of 7% per annum upon the par value of $100 per share before any dividend could be paid upon either the Class A or Common Stock. After November 1, 1927, dividends upon the 7% Preferred Stock were cumulative. At the time of the adoption of the Plan of Recapitalization, accrued and unpaid dividends on that stock amounted to $26.25 per share, or an aggregate of $5,965,260. The 7% Preferred Stock was callable at $110 per share and accrued unpaid dividends, and, in the event of liquidation, was entitled to receive $110 per share and accrued unpaid dividends before anything was distributed on account of the Class A or Common Stock.

5. The former Class A Stock was of no par value and was entitled, after all dividend requirements on the 7% Preferred Stock were met, to receive, when and as declared by the board of directors on and after November 1, 1930, dividends in the amount of $5 per share annually before any dividend could be paid upon the Common Stock. The Class A Stock was entitled to cumulative dividends from and after November 1, 1930. At the time of the adoption of the Plan of Recapitalization, accrued and unpaid dividends upon the Class A Stock amounted to $21.25 per share, or an aggregate of $6,656,265. The Class A Stock was callable at $75 per share and accrued unpaid dividends, and, in the event of liquidation, was entitled to $75 per share and accrued unpaid dividends after full payment on the 7% Preferred Stock before anything was distributed on account of the Common Stock.

6. No dividends have ever been paid on the Class A Stock.

7. The former Common Stock was without par value, and was entitled to receive such dividends as may have been from time to time declared by the board of directors, after the requirements in respect of dividends upon the 7% Preferred and Class A Stocks had been met.

8. No dividends have ever been paid on the former Common Stock.

9. Each share of all of the three former Classes of stock was entitled to one vote.

10. Each share of the new $6 Preferred and Common Stock outstanding is entitled to one vote.

11. On December 14, 1934, the board of directors of defendant adopted the Plan of Recapitalization now under attack; declared advisable an amendment to defendant's Certificate of Incorporation to effectuate the Plan; and provided that the Plan and amendment should be submitted to a vote of stockholders at their annual meeting on February 19, 1935. The directors also fixed the close of business on January 19, 1935, as a record date for a determination of the stockholders entitled to notice of, and to vote at, the foregoing annual meeting.

12. Section 5 of Article VI of the By-Laws of the defendant corporation authorized the board of directors to close the stock transfer books or fix a record date "and only such stockholders as shall be

stockholders of record on the date so fixed, shall be entitled to such notice of, and to vote at, such meeting * * * notwithstanding any transfer of any stock on the books of the Corporation after any such record date fixed as aforesaid." Further, Section 2 of Article VI of those By-Laws provides in part that, "Except as otherwise provided in Section 5 of this Article VI, the person in whose name shares of stock stand on the books of the Corporation shall be deemed the owner thereof for all purposes as regards the Corporation."

13. The Plan of Recapitalization and Amendment provided for the reclassification of each share of former 7% Preferred Stock together with dividends accrued thereon into 1.4292 shares of new $6 Preferred Stock; for each share of Class A Stock, together with dividends accumulated thereon into five shares of new Common Stock; and each share of old Common Stock was reclassified into one share of new Common Stock.

14. Plaintiff was a young commercial artist in May, 1934. She had worked for a living since she was 21 years old. In 1934 she married Frederick W. Dunn, a young architect. His income was modest. She continued her work as a commercial artist. She did not follow the stock market. She never engaged in litigation except to sue to collect small amounts due her. Prior to 1934 she had never bought or sold securities and neither had she received gifts of nor inherited securities. Mrs. Dunn's maiden name was Tirzah Perfect. Her sister, Miss Josephine Perfect, was engaged to Mr. Charles U. Bay for a considerable period of time and they are now, I believe, married. Her mother's name is Mrs. Tirzah P. Perfect. Between the Fall of 1936 and the time her deposition was taken in September, 1940, Mrs. Dunn had seen Mr. Bay only twice.

15. Mr. Charles U. Bay is an extensive trader in securities. He initially directed the opening of the margin account standing in Mrs. Dunn's name at Jenks Gwynne & Company, a brokerage firm in New York City, where the account was kept until July 31, 1938. On that date Jenks Gwynne & Company went into liquidation. Mr. Arthur C. Gwynne, formerly a partner of Jenks Gwynne & Company, became a partner of Mr. Bay in A. M. Kidder & Co. on August 1, 1938. Mr. Howard Ginder, formerly head bookkeeper of Jenks Gwynne & Company became head bookkeeper of A. M. Kidder & Co. Mr. Gwynne and Mr. Ginder are the liquidators of the partnership of Jenks Gwynne & Company. Since August 1, 1938, the account in Mrs. Dunn's name was carried at A. M. Kidder & Co. Mr. Bay held a power of attorney signed by Mrs. Dunn and dated May 12, 1934, authorizing him to buy, sell and trade securities in her name and for her account. At that time Mr. Bay was a limited partner in the brokerage firm of A. M. Kidder & Co. He later became a general and the senior partner in that firm. Mr. Bay was president and owner of all the stock of the Bridgeport Securities Corporation, except directors' qualifying shares, which company in turn owned all of the stock of Bay Newfoundland Company, Limited, except directors' qualifying shares. Mr. Bay was also president and a director of the Bay Newfoundland Company, Limited. He was also an officer and director of a number of corporations. By virtue of his position Mr. Bay was able to purchase and sell securities, which, in many instances, it was a foregone conclusion would result in a profit.

16. Mr. John Dabney Penick had been employed by A. M. Kidder & Co. since about April or May, 1933. Since 1933 Mr. Penick had performed a number of services which had resulted in a substantial profit to Mr. Bay and Bay Newfoundland Company, Limited. He was also an officer of Bay Newfoundland Company, Limited. Mr. Penick conducted the "day to day" handling of the account standing in the name of Mrs. Dunn. He recommended the purchase of the 500 shares of Class A Stock of the defendant for the account standing in the name of Mrs. Dunn. He recommended to Mr. Bay the purchase of the stock of the defendant for Bay Newfoundland Company, Limited, both prior to and after December 14, 1934. He directed the return of dividend checks received by Jenks Gwynne & Company upon the Common Stock into which the 500 shares of Class A Stock in the account in Mrs. Dunn's name had been reclassified. He advised counsel to sue defendant in the name of Mrs. Dunn. He negotiated with counsel for defendant in an attempt to settle this litigation. Mr. Penick testified he purchased the 500 shares of Class A Stock "as the agent for Tirzah P. Dunn." He further testified that in a letter previously written to the defendant he had "control" of the 500 shares of Class A Stock standing in the account in Mrs. Dunn's name. It was Mr. Penick's practice

to keep his customers reasonably well informed as to the various factors and news items that might affect the stock in which the customer was interested.

17. For at least six weeks prior to the meeting of the board of directors on December 14, 1934, the leading newspapers and financial journals carried articles and reports to the effect that some Plan of Recapitalization of defendant's Certificate of Incorporation was under consideration and imminent. These articles predicted plans showing various conversion possibilities and announced that there had been "more speculation" in the Class A Stock on the stock exchange in expectation of a recapitalization plan than in other issues of the defendant. These articles and the imminence of such a plan were known to Mr. Penick at the time he purchased the 500 shares of Class A Stock "as agent for Tirzah P. Dunn". For sixty days prior to December, 1934, Mr. Penick had recommended to Charles U. Bay the purchase of Class A Stock of the defendant, and as a result, 500 shares were bought for the account in the name of Mrs. Dunn, and 1,700 shares were bought for Bay Newfoundland Company, Limited. During this period Mr. Penick had been constantly discussing investment matters with Mr. Bay.

18. During October and until December 15, 1934, Bay Newfoundland Company, Limited, sold "puts" and "calls" for a substantial number of shares of Class A Stock of defendant.

19. On December 11, 1934, Mr. Penick placed an order for the 500 shares of Class A Stock involved in this suit pursuant to instructions from Mr. Bay. The 400 shares registered in the name of Foster, Marvin & Co. were delivered on December 13, 1934, into an account standing in plaintiff's name at Jenks Gwynne & Co., a brokerage house in New York City.

20. Immediately following the meeting of the directors of defendant on December 14, 1934, defendant caused a news release with respect to the proposed Plan of Recapitalization to be given to the press services in various parts of the country. On the evening of December 14, 1934, and on the morning of December 15, 1934, a summary of the Recapitalization Plan appeared in prominent New York newspapers, such as the New York World, New York Sun, New York Journal and American, New York Herald Tribune, New York Times, and the Wall Street Journal.

21. On January 2 or 3, 1935, defendant sent to its stockholders a notice of the meeting to be held on February 19, 1935, to which was attached a copy of the Plan of Recapitalization, the proposed amendment to defendant's certificate of incorporation, and a proxy form. The notice further advised the stockholders that the board of directors had fixed the close of business on Saturday, January 19, 1935, as the record date for the determination of stockholders entitled to notice of, and to vote at, the annual meeting of stockholders. There was also sent to the stockholders a letter from the Chairman of the Board of Directors explaining the Plan in detail and also setting forth the consolidated balance sheet for the fiscal year ending October 27, 1934. Plaintiff or her representatives received the notice to the stockholders and the letter in the early part of January, 1935.

22. Stockholders were advised in the letter as to the operation and effect of the Plan of Recapitalization; that the Plan was the result of the request of numerous stockholders; that because of the favorable financial condition of the company there was no necessity, from a standpoint of the operations of the business itself, to recapitalize the company; to keep in mind while considering the Plan that the working capital of defendant should not be decreased by the immediate payment of any substantial sum in reduction of accumulated dividends and that it was necessary to conserve working capital; that it was believed that the Plan submitted would be desirable and would be in the interest of stockholders inasmuch as the Plan eliminated all accumulated dividends and made possible the earlier payment of dividends to all stockholders when earnings were available for that purpose; that the consummation of the Plan was subject to the favorable action of at least a majority of each class of stock, and therefore each stockholder should carefully study the Plan and determine how the changes would affect his interest in the company; and that its adoption depended entirely upon the wishes of the stockholders expressed at the annual meeting to be held on February 19, 1935.

23. At the close of business on January 19, 1935, the record of the stockholders for the purpose of voting at the annual meeting on February 19, 1935, was closed. The stockholders on the list at the close of business on January 19, 1935, pursuant to the By-Laws of the Corporation and the resolu-

tion of the directors on December 14, 1934, were the only stockholders entitled to vote at the meeting, notwithstanding any transfer of any stock on the books of the corporation after that record date.

24. At the close of business on January 19, 1935, the 500 shares of Class A Stock of defendant involved in this suit appeared as follows: 400 shares in the name of Foster Marvin & Co., and 100 shares in the name of Wertheim & Co.

25. Thereafter, on January 23, 1935, defendant again forwarded to all its stockholders a letter directing their attention to the forthcoming meeting and to the fact that the Plan of Recapitalization was to be voted on at that meeting. Defendant expressed a desire to have a full representation of its stockholders and if they favored the adoption of the Plan, to send their proxies. Mr. Penick saw this letter shortly after it was mailed.

26. Again on February 5, 1935, defendant mailed a letter to stockholders who had not sent in proxies and the stockholders were again reminded of the coming meeting and the proposed Plan of Recapitalization. Mr. Penick saw this letter shortly after it was mailed.

27. On February 19, 1935, the stockholders of defendant met and voted in favor of the Plan and amendment. The vote with regard to the amendment was as follows:

mon Stock had been bought and sold on that Exchange. The stockholders, including the plaintiff, had been advised in the letter of the Chairman of the Board of defendant dated January 2, 1935, that application would be promptly made to register the new Preferred and Common Stocks on the New York Stock Exchange.

30. Again on February 23, 1935, the stockholders of defendant were advised that the new Preferred and Common Stocks had been listed and could be traded on the New York Stock Exchange. Between February 23 and April 19, 1935, 206,020 shares of the 227,233 shares, or 90.66% of the old 7% Preferred Stock outstanding prior to the adoption of the Plan of Recapitalization had been exchanged pursuant to its terms. Of the 313,205 shares of Class A Stock outstanding prior to the adoption of the Plan, 272,183 shares thereof, or 86.91%, had been exchanged under the Plan by April 19, 1935.

31. Further, on February 23, 1935, defendant advised its stockholders that the Plan of Recapitalization had become operative, that it was important that the old certificates be surrendered and exchanged for new certificates, and that the old certificates would no longer be "good delivery".

32. On February 26, 1935, three days after the Certificate of Amendment was filed and recorded, the Board of Directors of the defendant declared a dividend of

| Class of Stock | No. of Shares Issued and Outstanding and Entitled to Vote on Said Amendment and Resolution | No. of Shares Voted for Said Amendment and Resolution | No. of Shares Voted Against Said Amendment and Resolution |
|---|---|---|---|
| Preferred Stock | 227,233 | 163,945 | 100 |
| Class A Stock | 313,205 | 207,155 | 900 |
| Common Stock | 434,466 | 317,279 | 50 |
| Total | 974,904 | 688,379 | 1,050 |

28. On February 23, 1935, the Plan was made effective by the filing and recording of the Certificate of Amendment.

29. The present suit was filed April 19, 1935. On February 25, 1935, the new $6 Preferred Stock and the new Common Stock of the defendant were admitted to trading on the New York Stock Exchange. Between February 23, 1935 and April 19, 1935, 27,000 shares of the new $6 Preferred Stock, and 274,900 shares of the new Com-

$1.50 payable May 1, 1935, on the new $6 Preferred Stock, and a dividend of 12½ cents per share payable June 1, 1935, upon the new Common Stock. The defendant gave immediate publicity to the declaration of such dividends on February 27, 1935. These dividends were to be anticipated since the Chairman of the Board of the defendant, in his letter of January 2, 1935, to the stockholders, pointed out that in the event the Plan was adopted "the present Class

A and Common Stockholders, who have received no dividends since the stocks were issued in 1926, will be in a position to receive dividend payments, which, it is hoped, can be inaugurated in the early part of 1935. * * * I intend to recommend to the Board of Directors, if and when the plan becomes effective, the declaration of an initial dividend on the Common Stock in an amount to be determined at that time." Plaintiff or her representatives had seen this letter.

33. Defendant incurred expenses in carrying out the Plan. It paid to registrar agents, for the purpose of facilitating the exchange of certificates, $18,500; and to New York Stock Exchange, in connection with the listing of the new securities, $22,800.

34. At the annual stockholders' meeting of defendant, on February 19, 1935, Foster Marvin & Co. voted four hundred of the plaintiff's five hundred shares in favor of the Plan and the amendment. Foster Marvin & Co. on the record date, January 19, 1935, was the record holder of four hundred shares of the five hundred shares involved in this suit. The 400 shares of Class A Stock registered in the name of Foster Marvin & Co. were represented by four 100 share certificates numbered: NA 11274, NA 11275, NA 11140, NA 10947.

35. Plaintiff or her representatives caused the five hundred shares involved to be transferred from the names of the record holders into the name of Jenks Gwynne & Co. on February 4, 1935. The 500 shares of Class A stock in question have since February 4, 1935, always remained in the name of a former broker, Jenks Gwynne & Co.

36. Neither the plaintiff nor her representatives appeared at the stockholders meeting. Neither plaintiff nor anyone in her behalf took any action to prevent the registered holders from voting in favor of the Plan.

37. After defendant's Plan for Recapitalization had become effective on February 23, 1935, Henry B. Hodge, an attorney, wrote defendant on March 5, 1935, stating that the holders of 2,200 shares of Class A Stock, whom he represented, had instructed him to institute legal proceedings to declare the recapitalization void. The letter did not disclose the names of Hodge's clients.

38. Between the effective date of the Plan, February 23, 1935, and March 6, 1935, when the letter from Attorney Hodge was received, 43.14% of the old 7% Preferred Stock, and 53.33% of the Class A Stock had been exchanged pursuant to the Plan. Between those dates, 13,900 shares of the new $6 Preferred Stock and 129,500 shares of the new Common Stock had been traded in on the New York Stock Exchange. Furthermore, defendant had paid $22,800 for listing the new stock on the New York Stock Exchange and was committed to the payment of the fees of the registrars prior to receipt of Hodge's letter.

39. On April 19, 1935, a bill of complaint was filed in plaintiff's name against defendant in which it was alleged that Mrs. Tirzah P. Dunn was the owner and holder of 500 shares of Class A Stock of the defendant which were purchased and placed in the name of Jenks Gwynne & Co., brokers, New York City, New York.

40. On May 20, 1935, defendant filed a motion to dismiss the bill. On November 16, 1939, this Court entered an order granting defendant leave to withdraw its motion to dismiss and defendant filed its answer to the bill of complaint.

41. When Mrs. Dunn's deposition was taken in September, 1940, she possessed no record of any character which showed or tended to establish the fact of her alleged ownership except one brokerage statement from A. M. Kidder & Co. dated August 31, 1940, and this showed that 500 shares of defendant's Class A Stock were held in an account standing in her name.

42. Between 1934 and 1940 Mrs. Dunn's earned income ranged between $225 and $1,055.24 per annum.

43. On May 12, 1934, Mrs. Dunn gave Mr. Bay a power of attorney authorizing him to buy, sell and trade in securities in her name and for her account. Mr. Bay opened the margin account in Mrs. Dunn's name at Jenks Gwynne & Co. Mr. Bay loaned Mrs. Dunn $14,000 to open the account and took her notes in return for that amount. From time to time as the account in Mrs. Dunn's name needed additional money, Mr. Bay made advances and took additional notes from Mrs. Dunn. When the brokerage account had excess funds, these were withdrawn and applied by Mr. Bay upon the advances which he

had made to Mrs. Dunn. In a number of instances checks issued by Jenks Gwynne & Co. payable to the order of Mrs. Dunn were delivered to Mr. Bay's secretary, Mr. Kay, who endorsed Mrs. Dunn's name upon the checks and deposited them to Mr. Bay's credit.

44. Mrs. Dunn was never advised when stock had been bought or sold for her account. When Mrs. Dunn received brokerage statements, she sent them to Mr. Bay or Mr. Penick.

45. Once a year Mrs. Dunn received from Arthur Andersen & Co., accountants, her income tax returns which had been made up by them in New York. These reflected capital gains realized and losses sustained in the brokerage account. When these income tax returns were received, the brokerage house, at Mr. Bay's direction, would send to Mrs. Dunn a check exactly equal to the tax reflected on the return. These checks were endorsed by Mrs. Dunn to the order of the Collector of Internal Revenue.

46. Other checks that were received by Mrs. Dunn from the broker account were never deposited in her account or cashed by her. All such checks were returned to Mr. Bay.

47. The trading account which Mr. Bay operated in Mrs. Dunn's name was a substantial one. On September 30, 1936, her aggregate indebtedness was approximately $170,000. The brokerage account in Mrs. Dunn's name at Jenks Gwynne & Co. was an exceedingly active one and involved considerable transactions in which substantial profits were made. In one transaction a profit of over $46,000 was realized in less than five months' time (see discussion of the Gas Utilities transaction, infra).

48. The entire management of this account was solely in the hands of Mr. Bay. The control which he exercised over it was complete and unrestricted.

49. Mr. Bay testified that prior to the time when the account was opened he advised Mrs. Dunn that he would like to establish an account for her "as a means of making some material gains or profits for her."

50. In an attempt to explain his desire to help Mrs. Dunn through the operation of a brokerage account, Mr. Bay pointed out that he desired to establish five trusts at the First National Bank of Bridgeport under which his mother, two sisters, plaintiff's mother, Mrs. Perfect, and plaintiff's sister Miss Perfect would be beneficiaries. Miss Perfect had been engaged to Mr. Bay for a long time. Mr. Bay explained that he also desired to establish a trust for Mrs. Dunn but that Mrs. Dunn's husband had a great deal of pride and objected to the creation of a trust for his wife's benefit. Consequently Mr. Bay stated he established the brokerage account in lieu of creating a trust for her. Mr. Bay further testified that at the time when he spoke to Mrs. Dunn about opening an account in her name, the matter of trusts had been in his mind for a short time or several months, and he was in the process then of laying the foundation for some general benefactions and some financial assistance throughout his own family and those who were next closest to him, who were the Perfect family. The brokerage account in Mrs. Dunn's name was opened by Mr. Bay in May of 1934. The trusts for his mother, sister, and the others, were created by Mr. Bay on December 30, 1935.

51. Mr. Bay testified to the effect that Mr. Dunn "was not amenable to the suggestion of donating funds * * * to his wife." He further testified that in 1939 he gave 100 shares of Parke Davis Stock, having a value of $4,000, to Mrs. Dunn and that in 1940 a similar gift was made to her, but that both blocks of stock were placed in the brokerage account in Mrs. Dunn's name at A. M. Kidder & Co.

52. Mr. Bay testified that the letter dated January 2, 1935, embodied a previous understanding which he had with Mrs. Dunn and that it was written either January 2, 1935, or within a few days of that date. In the letter Mr. Bay stated: "I have loaned you various sums totaling to date $14,000, for which you have given me your notes *bearing 2% interest.* * * *" On January 2, 1935, Mr. Bay did not hold notes bearing 2% interest, but was in possession of notes of Mrs. Dunn carrying 6% interest. On March 12, 1935, Bay returned to Mrs. Dunn three notes aggregating $14,000 bearing 6% interest. The 2% interest notes Mr. Bay stated "undoubtedly they were signed subsequent to the date of my letter of March 12, 1935."

53. The evidence shows specific instances where Mr. Bay made year-end sales of unlisted and listed securities to

the account in Mrs. Dunn's name or to his brokerage firm, A. M. Kidder & Co., and then to the Dunn account, which resulted in beneficial income tax losses for Mr. Bay.

(a) Early in 1936 the Central Hanover Bank & Trust Company owned 73.6% of the Common Stock of Gas Utilities Company, which, in turn, owned 83.81% of Oklahoma Natural Gas Company Common Stock. On February 28, 1936, a group, of which Bay Newfoundland Company was one, wrote the Central Hanover Bank and offered to purchase in the aggregate the 250,000 shares of Gas Utilities stock at a price of $12 per share, or a total price of $3,000,000. In that offer it was stated in paragraph 10: "This agreement has been and is made solely for the benefit of yourselves and the undersigned and no other person shall acquire or have any right under or by virtue hereof." Bay Newfoundland Company's participation in the contract with the Central Hanover Bank was 31,500 shares, for which it agreed to pay $378,000.

(b) On March 12, 1936, the purchasers agreed among themselves to liquidate Gas Utilities and to distribute the Oklahoma Natural Gas common stock which was held by it.

(c) Bay Newfoundland Company acquired 6,500 shares for its own account and the balance of its purchase, 25,000 shares, were acquired by it as nominee for A. M. Kidder & Co. Bay Newfoundland Company actually acquired the 6,500 shares on June 12, 1936. On June 18, 1936, the directors of Gas Utilities Company adopted a resolution proposing to dissolve the corporation and calling a stockholders' meeting for July 13, 1936, to vote upon the dissolution.

(d) On July 8, 1936, Bay, who was then in Denver, was advised by wire of the fact that a meeting of the stockholders had been called for July 13, 1936. At the time, Bay was a director and chairman of the Executive Committee of the First National Bank of Bridgeport, Connecticut. On July 10, 1936, Mrs. Dunn borrowed $75,000 from that Bank and opened a new account with it in that amount. On the same day, Bay Newfoundland Company sold its 6,500 shares of Gas Utilities Company to an account in Mrs. Dunn's name for $84,045. Of the amount borrowed by Mrs. Dunn, $74,000 together with $10,500 from the account in her name at Jenks Gwynne & Co. was used to purchase the 6,500 shares of Gas Utilities from Bay Newfoundland Company. The shares so purchased were deposited as collateral for the loan. Six days later, on July 16, 1936, Gas Utilities Company was dissolved. Less than a month after Mrs. Dunn purchased the 6,500 shares, and on August 8, 1936, there was paid on those shares a liquidating dividend of 7,501.934 shares of Oklahoma Natural Gas Common Stock which had a then market value of $95,386.60; and in December, 1936, two cash liquidating dividends of $13,650 and $21,816.07 were paid on the 6,500 shares. The profit realized in Mrs. Dunn's name within a few months after she acquired the stock from Bay Newfoundland Company was $46,352.67.

(e) If Bay Newfoundland Company had retained the 6,500 shares of Gas Utilities and received the above stock and cash upon the dissolution of Gas Utilities, Bay Newfoundland Company's taxes would have been increased.

(f) 700 shares of Oklahoma Natural Gas received in the liquidation were sold on November 2, 1936. On December 10, 1936, 5,800 shares of the Oklahoma Natural Gas stock were sold for Mrs. Dunn to Bay Newfoundland Company. The loss on these two transactions amounted to $26,060.63, thus reducing the income tax on the account standing in Mrs. Dunn's name.

(g) The loan from the First National Bank of Bridgeport to Mrs. Dunn was liquidated with a portion of the cash she received on the liquidation of Gas Utilities and with a part of the cash received on the sale of the Oklahoma Natural Gas Stock received on the liquidation of Gas Utilities.

(h) The cancelled note for $75,000 was among Mr. Bay's papers which were produced and marked when his deposition was taken in April, 1942.

(i) The extent of Mrs. Dunn's knowledge of this transaction is disclosed by her letter of January 2 (1937) to Mr. Bay, following the receipt by her of the liquidating dividend in the amount of $13,650, in which she wrote: "* * * I have a check from the Gas Utilities Company on the Central Hanover Bank for the staggering sum of $13,650.00.—What do I do with it? I am terrified something will happen. Do I endorse it? I'd prefer not to put it through the bank here and give St. Louis inflated ideas of the Dunns. Shall I sent it to you? I'll keep it wadded up in an old shoe until I hear from you."

(j) The check for $13,650 was deposited in the bank account in Mrs. Dunn's name at the First National Bank of Bridgeport on January 18, 1937. Mr. Bay's testimony in explanation of the Gas Utilities transaction was that Bay Newfoundland Company acted as "agent" for Mrs. Dunn with respect to the purchase from the inception of the deal. The documents written contemporaneously with the transaction show the following: On July 10, 1936, Mr. Bay wrote Mrs. Dunn: "We wish to confirm * * * the sale to you today of 6500 shares Gas Utilities Common stock." On August 6, 1936, Mr. Bay, as President of Bay Newfoundland Company, wrote A. M. Kidder & Co.: "We are also acting in behalf of Mrs. Dunn who purchased directly from us 6500 shares of Gas Utilities stock originally purchased by us and sold to Mrs. Dunn." On its books of account, Bay Newfoundland Company treated the transaction as a sale by it on July 10, 1936, and on the account in Mrs. Dunn's name it was shown as a purchase on July 10, 1936. Two letters of Bay Newfoundland Company dated June 12, 1936, are to the same effect. On June 30, 1936, Stone and Webster wrote Bay Newfoundland Company and stated that in connection with the registration of Common Stock of Oklahoma Natural Gas, it was necessary for Bay Newfoundland Company to state its interest in Oklahoma Natural Gas and Gas Utilities, and requested of Bay Newfoundland Company a statement of the stock "owned" by it. On the back of that letter, Mr. Bay wrote: "Send in this report after checking at A. M. K.; we should show 6,500 Gas Utilities and A. M. K., firm, 25,000 * * *."

54. Since 1933, Mr. Penick had performed a number of services which resulted in a substantial profit to Mr. Bay or Bay Newfoundland Company. In fact, Mr. Penick was responsible for Mr. Bay's making a profit of as much as $300,000. Mr. Bay desired to further compensate Mr. Penick for these services. The deal in the Randall B Stock looked interesting, profitable and glamorous and Mr. Bay testified that "it appeared quite certain * * * that it was going to be profitable." Mr. Bay and those participating in the Randall B Stock deal contemplated selling the stock in one block rather than in the open market, that is, it was intended the stock should be "wholesaled to another firm at some step-up in price." Mr. Bay was going to compensate Mr. Penick by letting him participate in this transaction and Mr. Bay, rather than give Mr. Penick any part of the Randall B Stock held by Bay Newfoundland Company, decided to transfer to Mr. Penick 3,050 shares of Randall B Stock carried in the brokerage account in Mrs. Dunn's name. On October 26, 1936, 3,050 shares of Randall B Stock held in the account in Mrs. Dunn's name were sold to Florence Penick at $6.50 per share. At that time, the stock was selling on the Cincinnati Stock Exchange between 10⅝ and 10½. Two days previously, on October 24, 1936, Mrs. Dunn had apparently authorized J. Bergen & Co. to sell her other Randall stock (6,899 shares) on or before December 26, 1936, at 8¾ per share. Bergen & Co. apparently failed to find a buyer for the stock and Tobey & Co., on December 19, 1936, was given an option to buy the stock at $9.50 per share by each person holding Randall B Stock. Ultimately the Randall B Stock was not actually sold. Florence Penick was the young sister of J. Dabney, but Mr. Bay had never met her. Mr. Bay viewed Mr. Penick as "primarily * * * the beneficiary". Mr. Bay loaned Florence Penick the money to make the purchases and guaranteed her against loss. The amounts advanced by Mr. Bay for the Penick account amounted to $21,000. The journal entries explaining the cancellation of the Florence Penick notes held by Mr. Bay read as follows:

"On November 22, 1937, it was agreed that C. U. Bay take over the F. Penick account as of Jan. 1, 1937—in this connection the following information will explain this action—

"Mr. Bay, in consideration of some special work done for him by J. D. Penick, agreed to finance a brokerage account for Penick with the idea of making a profit for Penick * * *."

55. In the year 1936, the stock of the Randall Company was listed on the Cincinnati Stock Exchange, which was a registered national securities exchange. At that time Randall & Company had outstanding 100,000 shares of Class B Stock, an equity security. Section 16(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(a), then provided: "Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security * * * which is registered on a national securities exchange * * * shall file, * * * within ten days after he becomes such beneficial owner

* * * a statement with the exchange (and a duplicate original thereof with the Commission) of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been any change in such ownership during such month, shall file with the exchange a statement (and a duplicate original thereof with the Commission) indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month." Mr. Bay and Bay Newfoundland Company together had acquired 8,890 shares of Randall B Stock which was 8.89% of the outstanding stock. There was also purchased for the account in Mrs. Dunn's name, 9,949 shares, or 51 shares less than 10% of the issue.

56. A. M. Kidder & Co. only charged 1½% interest on the debit balance on the account in Mrs. Dunn's name. A partner of A. M. Kidder & Co. testified that the usual interest charges ranged between 2% minimum and 5% maximum. He further testified that whether 2% interest was charged in one case, or 5% in another, depended upon the desirability of the account. This in turn depended upon the financial desirability of the customer and the extent of the customer's trading; the necessity of meeting competition for a customer's business was another factor which entered into the determination of the interest rate which was charged.

57. In June, 1936, a "special account" was opened in the name of Mrs. Dunn at Jenks Gwynne & Co. Cash and securities in the special account could be withdrawn at any time and were exempt from the collateral restrictions imposed by the rules of the Securities Exchange Commission and the New York Stock Exchange. On June 1, 1938, the account in Mrs. Dunn's name had a credit balance of $9,267.75; on June 1, 1939, $5,107.89; and on June 1, 1940, $3,019.40.

58. Mr. Kay, Mr. Bay's secretary and also treasurer of Bay Newfoundland Company, maintained a ledger sheet of the account in Mrs. Dunn's name. Mr. Kay was not employed by Mrs. Dunn but was employed by A. M. Kidder & Co.

59. Mr. Penick, at Mr. Bay's direction, consulted an attorney about suing defendant and he instructed the attorney to bring suit in Mrs. Dunn's name.

60. Mrs. Dunn did not receive personally anything out of the brokerage account conducted in her name. Neither did Mrs. Dunn make any attempt to donate any of the property in the account in her name either to her family or anyone else prior to 1940. Immediately following the taking of her deposition in September, 1940, and within three weeks thereafter, Mrs. Dunn wired Mr. Kay, Mr. Bay's secretary, to "proceed at once with the transfer of stock to mother and sister as outlined." Mr. Kay sent the remaining stock in the account in Mrs. Dunn's name (except the 500 shares of Wilson A Stock and 4,000 shares of Randall B Stock which had been sold to reduce the debit balance in the account) to the First National Bank & Trust Company of Bridgeport, with instructions to transfer 240 shares of Universal Pictures Preferred into the name of Mrs. Dunn's sister, Josephine H. Perfect, and the remainder of the shares into the name of Mrs. Dunn's mother, Tirzah C. Perfect. The transfers were effected and the certificates returned to Mr. Kay by the First National Bank & Trust Company of Bridgeport under date of November 16, 1940. As ·to the 500 shares of Wilson A Stock remaining in the account in Mrs. Dunn's name, at the time of the trial that stock was still in the account in Mrs. Dunn's name at A. M. Kidder & Co. with a debit balance against it of $7,207.41. The certificates which were transferred to Miss Perfect and Mrs. Perfect were received about November 16, 1940, by Mr. Kay. On March 31, 1941, these certificates were still in a strong box in Mr. Kay and Mr. Bay's office, in which Mr. Bay kept personal papers and securities. Between the time when Mr. Kay's deposition was taken, and the time of the trial, the same certificates had been removed from Mr. Bay's strong box and deposited in Mr. Kay's safety deposit box in the Irving Trust Company.

61. The shares so purchased and owned beneficially by the plaintiff were nondividend paying stock and it was the recognized custom to keep the certificates representing such stock in the name of the broker.

62. On March 5, 1935, plaintiff's counsel wrote to defendant that the plan of recapitalization and the amendment were unfair, oppressive and illegal and that he had been instructed to institute legal proceedings. This letter was acknowledged by the defendant. Upon the refusal of

the defendant to acknowledge the rights of the plaintiff as asserted in counsel's letter of March 5, 1935, this suit was commenced on April 19, 1935.

63. On March 19, 1935, the plaintiff attempted to have the certificates representing the five hundred (500) shares of Class A Stock so beneficially owned by her and then registered in the name of her broker, Jenks Gwynne & Co., transferred into her own name. This was refused by the defendant's transfer agent.

### Discussion.

Keller v. Wilson & Co., 21 Del. Ch. 391, 190 A. 115, holds that it is beyond the power of a Delaware corporation to destroy a preferred shareholder's right to receive accrued dividends by means of amendment of the corporate charter, and that a preferred shareholder has the right to demand that his dividends be paid in cash before any further dividends are paid on the common stock. The details of the Wilson & Co. plan of reclassification —which gave rise to much litigation in Delaware—may also be found by reference to Keller v. Wilson & Co., 21 Del.Ch. 13, 180 A. 584; Id., 21 Del.Ch. 391, 190 A. 115; Id., 22 Del.Ch. 175, 194 A. 45; Frank v. Wilson & Co., Del.Ch., 9 A.2d 82; Id., Del. Ch., 32 A.2d 277; Bay Newfoundland Co. v. Wilson & Co., Del.Ch., 4 A.2d 668; Id., Del.Ch., 11 A.2d 278; Id., Del.Ch., 28 A. 157; Sapperstein v. Wilson & Co., 21 Del. Ch. 139, 182 A. 18.[1]

The sole question in this case is whether plaintiff has the benefit of the decision of Keller v. Wilson & Co., supra.

Her right to utilize that holding is challenged by defendant on six grounds. They are: (1) Plaintiff is guilty of laches; (2) the shares which plaintiff now owns were voted in favor of the plan; (3) she comes into equity with "unclean hands"; (4) she is not the real party in interest, i.e., neither the legal nor beneficial owner of the shares; (5) she has not been damaged by the plan; and (6) under Sapperstein v. Wilson & Co., 21 Del.Ch. 139, 182

A. 18, the complaint should be dismissed under the doctrine of res judicata.

I. *Laches.* Plaintiff started her action here on April 19, 1935. The plan was approved on February 19, 1935. Is this unreasonable delay? "What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances. No rigid rule has ever been laid down. Change of position on the part of those affected by non-action, and the intervention of rights are factors of extreme importance. The promptness of action demanded of a stockholder objecting to the accomplishment of a proposed corporate act which, although unauthorized, is capable of ratification, is dependent in a large degree upon the effect of his delay on others; and where many persons will be affected by an act that involves a change of capital structure and a material alteration of rights attached to stock ownership, the stockholder, having knowledge of the contemplated action, owes a duty both to the corporation and to the stockholders to act with the promptness demanded by the particular circumstances."[2]

The Delaware Chancery Court in Bay Newfoundland Co. v. Wilson & Co., 28 A. 2d 157, applied the laches doctrine of Havender to a set of facts which, when compared, are substantially similar to the facts of the instant case. The precise decision in the Bay Newfoundland Co. case was that delay in filing a complaint to set aside the Wilson & Co. charter amendment which adversely affected the class of stock held by the plaintiff in that case, which delay permitted rights of many persons to intervene, was not excused by nearly three years of negotiations between plaintiff and the company and the pendency of another suit involving the same issues. Plaintiff, in Bay Newfoundland,[3] had argued that one of the prime factors for not instituting its suit in the Delaware court sooner was the existence of the pendency of the case at bar. It relied on the proposition that, when the same question in controversy is involved in a suit pending between other parties, a

---

[1] Court decisions and statutes dealing with the power of corporations to cancel accrued and unpaid dividends by charter amendment, merger or other method, are discussed at length in Meck, Accrued Dividends on Cumulative Preferred Stocks: The Legal Doctrine, 55 Har.L.Rev. 77; Dodd, Fair and Equitable Recapitalizations, 55 Har.L.Rev. 780; Latty, Fair-

ness—The Focal Point in Preferred Stock Arrearage Elimination, 29 Vir.L.Rev. 1.

[2] Layton, C.J., in Federal United Corporation v. Havender, Del.Sup., 11 A.2d 331, 343.

[3] Bay Newfoundland Company, Ltd., a Canadian corporation, will be referred to herein as "Bay Newfoundland".

plaintiff may wait a reasonable time for a decision of that suit before bringing his own action. As the case at bar had not been decided when Bay Newfoundland brought its action in the state court, the Chancellor decided that nearly three years' delay was unreasonable.[4]

▮▮ The importance of the decision in Bay Newfoundland Co. v. Wilson & Co., supra, to our problem is that, in the presence of the same factors involving "intervening rights" of many other persons, the Chancellor recognized, at least impliedly, that the institution of the case at bar would not subject it to the defense of laches.[5] As this is the best reading I am able to give to that decision,[6] under one view it may be said that I am bound to follow and apply it. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. Under the other view, it may be said that a federal court in applying the equitable doctrine of laches applies its own rules developed from English chancery practice without limitation by state decisions. Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227. Thus, federal equity jurisdiction remains—in the face of Erie R. Co. v. Tompkins—unaffected, Noonan v. Lee, 67 U.S. 499, 2 Black 499, 17 L.Ed. 278; In re Broderick's Will, 21 Wall. 503, 22 L.Ed. 599; because as equitable remedies are wholly the creatures of federal laws, they are uncontrolled by decisions of the state courts. Gormley v. Clark, 134 U.S. 338, 10 S.Ct. 554, 33 L.Ed. 909; Bardon v. Land & River Improvement Co., 157 U.S. 327, 15 S.Ct. 650, 39 L.Ed. 719. If the question of whether plaintiff is guilty of laches is one open to the application of an independent federal view, then I think the result is the same, because plaintiff, I conclude from the facts, should not be barred.

Accordingly, I do not find the present plaintiff guilty of laches in not instituting her suit in this court sooner.

▮ Likewise, plaintiff should not be barred for her failure to prosecute the action in this court with diligence. In reaching this conclusion, I am not unmindful that the mere institution of a suit does not of itself relieve a person from the charge of laches, if a party fails in the diligent prosecution of his action. Johnston v. Standard Mining Co., 148 U.S. 360, 13 S.Ct. 585, 37 L.Ed. 480; Abraham v. Ordway, 158 U.S. 416, 15 S.Ct. 894, 39 L.Ed. 1036; Willard v. Wood, 164 U.S. 502, 17 S.Ct. 176, 41 L.Ed. 531; O'Brien v. Wheelock, 184 U.S. 450, 22 S.Ct. 354, 46 L.Ed. 636; Gill v. Colton, 4 Cir., 12 F.2d 531, and the cases there cited. The docket entries in the present case show:

April 19, 1935—Bill of complaint filed.

May 20, 1935—Motion to dismiss filed.

November 16, 1939—Order granting defendant leave to withdraw its motion to dismiss.

November 16, 1939—Defendant's answer filed.

March 19, 1941—Motion that case be set for trial.

May 5, 1942—Trial commenced.

▮▮ Defendant, having filed its motion to dismiss, was the moving party. The dockets and minute-books of this court fail to disclose that defendant made any effort to bring its motion on for hearing. As my initial appearance as a judge of this court was on February 2, 1942, I have no accurate method of determining which party was not diligent in bringing the case on for trial before that time. The facts adduced at the trial before me show, how-

---

[4] Here, within ten days after the adoption and filing of the amendment, plaintiff through her counsel informed defendant that the intended invasion of plaintiff's rights would be contested. She followed by institution of suit in this court on April 19, 1935.

[5] It is significant that in an earlier opinion it was stated in Bay Newfoundland Co. v. Wilson & Co., Del.Ch., 4 A.2d 668, 673: "True, suit was not promptly brought, but there is nothing to clearly indicate any change in its position with respect to the amendment. While not a party to the Dunn suit, which was brought in the Federal Court for the District of Delaware, in April of 1935, the bill alleges that that suit was intended

to determine its rights. The bill, also, alleges that the complainant knew of the pendency of the Keller suit, both in this court and in the Supreme Court, and that 'proceedings in the said Dunn cause, and otherwise, on behalf of' the complainant 'were delayed pending the decision' of that case."

[6] Of course, the Delaware Chancellor made no finding whatsoever on the plaintiff's right to maintain her suit here; if he had, it would have been beyond his ken. All we can do is to glean what the Delaware court would have decided if the present action had been instituted in a Delaware court and plaintiff here had been met with the defense of laches.

ever, that throughout this period the parties were negotiating a settlement, especially after the rights of plaintiff's class of shareholders had been determined by the Supreme Court of Delaware in Keller v. Wilson & Co., supra, on November 10, 1936. I conclude plaintiff is not guilty of prosecuting this action without diligence, so as to constitute a prejudicial delay to defendant.

II. *The shares alleged to be owned by plaintiff were voted in favor of the amendment.* 400 of the 500 shares of plaintiff registered in the name of Foster Marvin & Co. were delivered to Jenks, Gwynne & Co. on December 14, 1934, for plaintiff's account. Wilson & Co. fixed January 19, 1935, as the record date for determining the shareholders entitled to vote at the February 19, 1935, meeting. Notice and a proxy were sent to Foster Marvin & Co. on January 3, 1935. Among the proxies received by defendant, was one signed by Foster Marvin & Co. bearing the notation "8915 Common, *6155 'A'*, and 1650 Pfd." On January 19, 1935, the record date fixed by the directors, Foster Marvin & Co. was the registered holder of 6,205 shares of Class A Stock. From this, defendant argues that as the Foster Marvin & Co. proxy was for 6,155 shares of Class A Stock, and as it was the registered holder of 6,205 shares, the 400 shares allegedly owned by plaintiff were, of necessity, voted in favor of the amendment; plaintiff is, therefore, bound by the vote cast pursuant to the Foster Marvin & Co. proxy.

Defendant marshals the Delaware law in support of this contention. Atterbury v. Consolidated Coppermines Corporation, Del.Ch., 20 A.2d 743, is relied on for the proposition that the real or beneficial owners of shares of stock in a Delaware corporation who permit their shares to be held in the name of nominees are presumed to know that such nominees will have the power to vote the shares without obtaining the consent of such owners, and that the corporation whose shares are involved may recognize the registered owner as the true owner. In re Giant Portland Cement Co., Del.Ch., 21 A.2d 697, which involved the question whether the vote cast by a registered holder had been properly counted for an election of directors, where the registered holder was not the owner of the stock on the meeting date, is next relied

on for the proposition that the actual consent of the beneficial owner, and holder of the certificate, is not required for the record owner to vote the stock, as, in the absence of objection on the part of the beneficial owner, such consent is presumed. Yet, it is conceded that, In re Canal Construction Co., 21 Del.Ch. 155, 182 A. 545, the registered owner cannot vote the shares in defiance of the real owner's wishes.

So, defendant argues, if plaintiff had appeared at the meeting and challenged the right of Foster Marvin & Co. to vote, or if she had unsuccessfully attempted to get a proxy from that firm, or had instructed the registered owner not to vote in favor of the amendment, she would not be bound by the vote cast, under the Delaware cases. Hence, it is insisted that the court should give effect to the language of Sec. 17 of the General Corporation Law of Delaware, Rev.Code of Del. 1935, 2049, and Art. VI, Sec. 5 of defendant's By-Laws, which provides that, when the transfer books are closed, or a record date for determining those stockholders entitled to vote has been fixed, the registered owner and not the real or beneficial owner should be entitled to vote.

On December 13, 1934, when Foster Marvin & Co. endorsed and delivered the certificates, title to the stock passed to Jenks, Gwynne & Co., on behalf of plaintiff, independently of registration, because, under the rule in Delaware, as between the transferor and the unrecorded transferee of the stock certificates, legal title passes to the latter. In re Giant Portland Cement Co., supra; State ex rel. Cooke v. New York-Mexican Oil Co., 2 W. W. Harr. 244, 32 Del. 244, 122 A. 55; Bankers' Mortg. Co. v. Sohland, 3 W. W. Harr. 331, 33 Del. 331, 138 A. 361; Chadwick v. Parkhill Corp., Ltd., 16 Del.Ch. 105, 141 A. 823; Drug, Inc., v. Hunt, 5 W.W. Harr. 339, 35 Del. 339, 168 A. 87; In re Canal Construction Co., 21 Del.Ch. 155, 182 A. 545.

The Giant Portland Cement Co., Consolidated Coppermines Corporation, and Canal Construction Co. cases, supra, were concerned with the question as to what persons, under the Delaware Corporation Law, were entitled to vote at a stockholders' meeting for directors. The question here is quite different; it is whether plaintiff has acted in such a way that she should be estopped from asserting that her contrac-

tual rights have been invaded by the charter amendment because she tacitly allowed a former owner of the shares to vote for approval of the plan. The basic facts show Foster Marvin & Co. divested itself of title in the shares on December 13, 1934. On February 4, 1935, these shares were transferred to and registered on Wilson & Co.'s books in the name of Jenks, Gwynne & Co. Then, on February 15, 1935, the old owner—Foster Marvin & Co.—gave a proxy to defendant. Thus, defendant relies upon a proxy—to tear down the present right of action—signed by one who was neither the owner nor the registered holder on the dates the proxy was signed and voted. Obviously, the record of the transfer on its own books was notice to defendant that Foster Marvin & Co. had no proprietary interest in the proposed amendment to be voted on at the stockholders' meeting on February 19, 1935. How, then, could the proxy of February 15, 1935, in any way lead defendant to believe that Jenks, Gwynne & Co. as nominee of plaintiff, approved the plan of recapitalization?

■ All elements of estoppel, I find, are lacking. There was no false representation by plaintiff. Defendant was not deceived. The proposition of defendant comes down to this: One who is not, in fact, a stockholder, and who is wholly without interest in a proposed amendment to a corporate charter, may be able by his vote to affect the rights of the real shareholder even where the action taken is beyond the scope of corporate power. As I indicated before, defendant's cited Delaware cases arise under Section 31 of the General Corporation Law of Delaware, Rev.Code Del.1935, § 2063; but they are obviously and should not be controlling on the question here. The real question before me of whether defendant was mislead by acts of plaintiff, whereby she should be estopped to complain against the illegal action taken by defendant in attempting to wipe out her arrearage dividend claim by charter amendment, I resolve in favor of plaintiff. By becoming a stockholder of record before the meeting and not being permitted to vote, by rules of corporate convenience, against the plan, plaintiff was not an abject shareholder who felt futile to oppose management's plans, especially in

the light of her immediate attack in an attempt to preserve her rights. Plaintiff, as I view it, was under no duty to instruct Foster Marvin & Co. to vote against the plan. Likewise, plaintiff was under no duty to become a registered holder prior to the record date. In short, I find that estoppel defense can not be raised on the facts presented here.

■ Plaintiff's acts do not indicate, I conclude, an intentional relinquishment of her rights as an owner of Class A Stock. Plaintiff, in not voting in favor of the plan, in having her attorney advise defendant ten days after the plan was approved by other stockholders that she would litigate, in instituting her suit in this court, in returning all dividend checks sent to her by defendant (declared on the new common stock she would have held if she had converted under the plan), and in retaining the certificates representing her Class A Stock, shows non-acquiesence in the action taken at the February 19, 1935, stockholders' meeting.

■ III. *Plaintiff comes into court with unclean hands.* "The clean hands maxim bars relief to those guilty of improper conduct in the matter as to which they seek relief. It is invoked to protect the integrity of the court", 30 C.J.S., Equity, § 93.[7] The complaint alleges plaintiff acquired her shares without knowledge of any proposal of the plan three days before defendant's board, on December 11, 1934, called the stockholders' meeting to vote on the charter amendment. The evidence indicates that for some weeks prior the metropolitan New York press had discussed the possibility of a plan which, it later developed, was not the same as the plan finally submitted to the stockholders by defendant's management. Sixty days prior to December, 1934, Penick, after making an intensive study of defendant's past performances (and the packing industry in general), recommended to Bay the purchase of some Wilson & Co. A stock. Thereafter, 500 shares were bought for plaintiff and 1,700 for Bay Newfoundland. The evidence is unclear whether Penick was plaintiff's agent, but he gave his advices to Bay, who unquestionably represented her.

---

[7] See, too, Haggerty v. Wilmington Trust Co., 22 Del.Ch. 152, 194 A. 134; Electrical Research Products v. Vita-phone Corp., 20 Del.Ch. 417, 171 A. 738; Sharpless-Hendler Ice Cream Co. v. Davis, 17 Del.Ch. 161, 151 A. 261.

When plaintiff purchased her shares, regardless of the financial publicity that had been given to a proposed Wilson & Co. plan, she had the right to expect that, if a plan was submitted, it would not only be fair and equitable but *legal*, qualities which, as the Supreme Court of Delaware found later, were not inherent in the Wilson & Co. plan finally submitted. It was not until the January 3, 1935, notice that the Wilson & Co. stockholders actually knew the details of how the plan affected the rights of the Class A Stock. Defendant's literature, issued by its management, made no such disclosures prior to plaintiff's acquisition of her shares. It is a fact which I plainly recognize that Bay Newfoundland, as the alter ego of Bay, was active in Wilson & Co. stock. It had both "puts" and "calls". Its transactions between October 18, 1934, and December 15, 1934, involved substantial sums.

Manifestly, defendant's stock was purchased for purposes of speculation by Bay and his company. But, this forms no basis to imply that such purchases were made for the additional purpose of projected litigation. In fact, the acts of the parties indicate the speculation motif was primary throughout. On May 24, 1935, the late Chancellor Wolcott's opinion was filed in Keller v. Wilson & Co. approving the plan. 21 Del.Ch. 13, 180 A. 584. On November 10, 1936, he was reversed by the Delaware Supreme Court. 21 Del.Ch. 391, 190 A. 115. In the interim, plaintiff sold short 2,500 shares of common stock; this was the number of shares of common into which plaintiff's 500 Class A were convertible under the plan. The short sales were palpably made as a hedge against the Delaware Supreme Court affirming the lower court and holding the plan valid. Instead of converting her Class A Stock, plaintiff purchased in the open market 2,500 shares of Common and covered her short position. I have sought in vain to discover how these acts impinge on the integrity of the court, which is the basis of the "unclean hands" doctrine. The facts show that, during this period and prior as well as after, plaintiff purchased and sold shares in other corporations. The purpose of maintaining her account was to make money. Her dealings in defendant's stock can be rationalized; and plaintiff's financial advisors had a basis in recommending the purchase of defendant's shares.

The packing industry is a cyclical business. Profits depend on price movements in raw materials. This, in turn, depends on the quantity of livestock the raiser sends to market. Livestock values and meat prices are not, therefore, completely within the control of the packer. After 1932, it became apparent that the administration in Washington looked to a raise in price of farm products. The evidence discloses that in 1935 the past history of the industry showed hog prices had gone up since 1932; but while hog prices were high, the corn and hog ratio was not favorable. The 1934 drought had reduced the corn crop. In 1935, the government policy of slaughtering was in doubt; the price of hogs had risen to $10.95 a hundredweight—the highest since March of 1929; the corn and hog ratio, normally 11.2, had advanced to above 13. In 1932 the price of hogs was low and the corn and hog ratio was high—an ideal position—but in 1935 the price of hogs was high and the corn and hog ratio was high also, all of which meant that the packers would have to absorb certain inventory losses with a dropping off of earnings. There was, therefore, some justification from a profit-making point of view for plaintiff to engage in short sales.

The second attack of unclean hands leveled at plaintiff, on the basis of certain false representations as to the ownership of the Dunn stock during negotiations for settlement, is without merit. Penick, it is argued, in the early part of 1937 lead defendant to believe that the shares in suit were owned either by A. M. Kidder & Co., Bay, or Bay Newfoundland. This particular argument is frivolous. There was no attempt made to misrepresent to defendant a year and a half after this suit was commenced that anyone other than plaintiff owned the shares; it also knew that Penick, in conducting negotiations, was speaking for Bay Newfoundland, and Bay as attorney-in-fact for Mrs. Dunn.

The third charge of unclean hands is that the present suit, financed and controlled by Bay, was utilized for the purpose of attempting to compel defendant to purchase Bay Newfoundland's 1,700 shares of Class A Stock. In support of this position, it is emphasized that Mrs. Dunn's testimony is vague and uncertain; she had little knowledge of the institution of

the present proceedings; Bay has deliberately attempted to keep himself and his company (Bay Newfoundland) in the background in the hope that defendant would buy his company's 1,700 shares of Class A Stock without the necessity of the latter company exposing itself to the publicity which frequently attends litigation. Thus, defendant's argument, as I see it, is that, where a plaintiff is a mere nominee for another who seeks to benefit from the former's success in litigation, and the cause is financed and controlled by the latter, the court should dismiss the suit as it is not bona fide.[8] From the basic evidence it appears the present suit has been in the hands of plaintiff's attorneys throughout. Penick shows counsel for plaintiff, who at the same time represented Bay Newfoundland, advised defendant, as early as March 5, 1935, that he had been instructed to bring suit on behalf of shareholders owning 2,200 shares of Class A Stock. On March 16, 1935, plaintiff's counsel, representing both her and Bay's company, met with certain officers of defendant to discuss the situation.

An opinion had been given by counsel that rights of both clients could be determined in a suit brought by one of them in the light of the fact that there were already two independent suits in the Delaware courts arising out of the amendment to defendant's charter,[9] which suits would largely determine the rights of holders of Class A Stock. Moreover, defendant knew that on March 17, 1935, Mrs. Dunn attempted to have her certificates registered in her own name, but such transfer was refused. On February 19, 1938, Bay Newfoundland filed its bill of complaint in the Delaware Court of Chancery, which sought the same relief which plaintiff now seeks here. See Bay Newfoundland Co. v. Wilson & Co., 28 A. 2d 157.

The so-called deposit of $1,331.60 by Bay Newfoundland to plaintiff's account, presumably for the purpose of financing the present liquidation, is explained away; the deposit was the result of a certain transaction between plaintiff and Bay Newfoundland,[10] under which she was entitled to that sum. On this phase of the case, I conclude the present action was instituted primarily for the benefit of Mrs. Dunn. After every attempt to negotiate a settlement had failed, Bay Newfoundland then instituted its own suit in a different court, but only after it had attempted unsuccessfully to intervene in these proceedings on January 19, 1938.

IV. *Plaintiff does not own the stock in suit.* A substantial portion of the defense in this case swings around the proposition that a great body of circumstantial evidence points to the hypothesis that Mrs. Dunn fails to comply with Rule 17(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, in that she is neither the legal nor equitable owner of the 500 shares which she alleges she owns.

 The argument that she is not the legal owner of the shares, because the certificates stand in the name of Jenks, Gwynne & Co., is unsound in view of the Delaware law that once a certificate is endorsed and delivered legal title passes to the transferee.[11] But, whether plaintiff is the equitable owner, raises an issue of fact which in this case must be decided by the court sitting as a one-man jury.

 Defendant reviews Mrs. Dunn's hazy recollection, concerning her act of signing and filing the complaint in this suit, and her apparent inability to remember that suit had been instituted when she was questioned by an employee of one of the bonding companies, who was seeking information concerning the cost bond she had been required to file in these proceedings. Defendant then asks the court to review the period

---

[8] Defendant relies on Filder v. London, Brighton & South Coast Ry. Co., 1863, 1 Hem. & Mill. 489; Forrest v. Manchester Sheffield & Lincolnshire Ry. Co., 1861, 4 Deg. & J. 126; and Belmont v. Erie Ry. Co., 1869, 52 Barb. 637. These cases deal with suits inspired by competitors of the defendants. I have difficulty in working their principle into the facts under this heading of the case at bar.

[9] Cf. Keller v. Wilson & Co. and Sapperstein v. Wilson & Co., supra.

[10] The "Gas Utilities" transaction, to be discussed infra.

[11] In re Giant Portland Cement Co., Del.Ch., 21 A.2d 697; State ex rel. Cooke v. New York-Mexican Oil Co., 2 W.W. Harr. 244, 32 Del. 244, 122 A. 55; Bankers' Mortg. Co. v. Sohland, 3 W.W.Harr. 331, 33 Del. 331, 138 A. 361; Chadwick v. Parkhill Corp., Ltd., 16 Del.Ch. 105, 141 A. 823; Drug, Inc., v. Hunt, 5 W.W. Harr. 339, 35 Del. 339, 168 A. 87; In re Canal Construction Co., 21 Del.Ch. 155, 182 A. 545.

from May 12, 1934, to September 18, 1940, and points out that the account standing in plaintiff's name was dominated and controlled by Bay alone, and that she derived no benefit from it.

Here are the facts. On May 12, 1934, Mrs. Dunn gave Bay a power of attorney, authorizing him to buy and sell securities in her name and for her account. At the outset, Bay lent plaintiff $14,000 to open the account and took her notes as security for the loan. As she required additional funds, he advanced various sums and received additional notes. As the account showed profit, Bay withdrew them and gave credit on the notes. Mrs. Dunn was never advised when stocks had been bought or sold for her account. Each year, however, she received from a firm of accountants in New York her income tax returns which reflected gains made and losses sustained in the account. Bay would then send her a' check for the amount of tax due, which plaintiff would endorse over to the Collector of Internal Revenue. Her margin account was substantial. For example, on September 30, 1936, her debit position was $170,000. At one time, on a transaction involving securities of Gas Utilities Company, she realized a profit of $46,000 in less than five months time. Yet, from May 12, 1934, to September 18, 1940, she never received one dollar which she used for her personal benefit.

Her account was established at the suggestion of Bay, who was a friend of Mrs. Dunn's family. Bay had been successful with certain manufacturing companies of surgical supplies and dressings. In 1934, after finding prosperity himself, he considered making plans for his own family and those next closest to him. He became engaged to plaintiff's sister, Miss Josephine Perfect, whom he has since married. The relationship between Bay and plaintiff, her mother and sister was close. His first suggestion that he make a gift to plaintiff was rejected—in view of plaintiff's husband's objection. It was agreed, then, that Bay would open a brokerage account for plaintiff and operate it for her benefit. Later, Bay executed various irrevocable trusts for the benefit of his own family and for other members of plaintiff's family. These gifts suggest Bay's desire to share his gains. The mere fact that he had more than one method of carrying out his desire to assist others cannot cast suspicion on the creation of plaintiff's brokerage account.

Plaintiff had faith and confidence in Bay. As I view it, it is not unusual for a lady of plaintiff's type to be unfamiliar with the intricacies attendant to the operation of a margin account. Apparently, it was not plaintiff's intention to take profits until the account was closed out. Then, after a considerable profit had accumulated, it was her hope that she might be able to make a substantial contribution to her mother and sister. This view is supported by the facts. In October, 1940, Mrs. Dunn gave all the securities in her account to her mother and sister, except the 500 shares of Wilson & Co. Class A Stock.

Nothing can be made of the fact that Bay in 1937 persuaded plaintiff not to close out her account, although she was most anxious to terminate the relationship. Bay advised her that for income tax purposes, as the account contained certain items which had appreciated, it would be preferable to allow the account to stand.

Out of the many transactions which may be found in plaintiff's account, defendant seizes on five isolated transactions to show that the account really belonged to Bay and not to plaintiff. Here they are:

(a) The Cochran Physician's transaction: On December 30, 1935, Bay sold to plaintiff 1,000 shares of Cochran Physician's Supplies, Inc., a company engaged in the retail business of selling surgical supplies, for $5,000. He paid $13,000 for these shares. True, Bay took advantage of the loss he sustained in his income tax return. But, plaintiff, purchasing the shares for $5,000, later sold the stock for $10,000. The record would seem to indicate that Bay had other motives besides the advantage of taking a tax loss in selling the shares to Mrs. Dunn for less than he paid for them. Bay was, as of this time, interested in Parke, Davis & Company and Penn Surgical Manufacturing Company, who were competitors of Cochran Physician's Supplies; and there was some criticism of his interest in the retail establishment of Cochran Physician's Supplies, while at the same time, he was interested in the two other concerns. Moreover, as he was close to this particular type of business, Bay concluded Cochran Physician's Supplies was on the decline; but, at the same time, he thought it would be a good investment for plaintiff at $5,000. It was. As it later developed, she doubled her money. I fail to see how this transaction casts any light on the question that

plaintiff does not own the 500 shares· of Class A Stock of Wilson & Co., which is the basis of this suit.

(b) The First National Bank of Bridgeport transaction: On December 28, 1935, Bay sold 1,668 shares of the First National Bank of Bridgeport to Kidder & Co. of Bridgeport, Connecticut, at the then market price, and at a loss of $6,585.34 which he took advantage of in his then current income tax return. On June 5, 1936, plaintiff purchased 1,668 shares of this stock from Kidder & Co. for $10,475.36. Subsequently, she sold 1,400 of these shares at a profit of $2,256.57. The remaining 268 shares she later transferred as a gift to her mother (when she closed out her account). This transaction is obviously without relation to the question of whether plaintiff owns the particular stock which is the basis of this suit.

(c) The Gas Utilities Company transaction: In 1936, Central Hanover Bank & Trust Company owned 73.6% of the Common Stock of Gas Utilities Company which owned, in turn, 83.81% of Oklahoma Natural Gas Company Common Stock. On February 28, 1936, a syndicate offered the bank $3,000,000 for its holdings. The offer was accepted. On March 12, 1936, the purchasers agreed to liquidate Gas Utilities. Of the 31,500 shares allocated to Bay Newfoundland, 25,000 were acquired by it as nominee for Kidder & Co. Gas Utilities voted to liquidate. Just prior to the liquidation, Bay Newfoundland sold its 6,500 shares to plaintiff for $84,045. Plaintiff, when she received her liquidating dividends —common stock of Oklahoma Natural Gas having a market value of $95,386 and cash dividends of $35,466.07—realized a profit of $46,352.67.[12] Three months later plaintiff sold the 6,500 shares to Bay Newfoundland at market and at a loss.

Defendant's argument that this transaction was set up in the form it took in order to effect a tax dodge for the benefit of Bay Newfoundland is not completely supported by all the facts. It would appear that the original intention was for Kidder & Co. to

participate to the extent of 31,500 shares and plaintiff 6,500 shares. Neither were named in the syndicate agreement, as the managers of the agreement—Stone & Webster—desired as few names as possible to appear in the transaction. In fact, other sub-groups were represented by members of the syndicate. Bay Newfoundland originally acquired the 6,500 shares as nominee of plaintiff. This technic was followed upon the advice of Arthur Andersen & Company, accountants. The price of the shares was established upon the basis of cost to Bay Newfoundland as agent, plus expenses and commissions paid by Bay Newfoundland. Price was not determined, therefore, upon market value.

In fact, there was a difference in the market price of the shares—which was higher—and the large block of stock held by Central Hanover. It seems to me that the evidence shows a real interest of plaintiff in the transaction, and her participation was not for the simple purpose of assisting Bay Newfoundland to dodge taxes. Bay Newfoundland is a Canadian corporation. If it had first bought the 6,500 shares in Canada and received the liquidating dividends thereon, it might very well be that the sale would not have been reported or taxable. This negatives a design on the part of Bay Newfoundland to avoid taxes.

Plaintiff, from the documentary proof, was fully aware of the whole transaction I conclude that, here again, there is no showing which affects plaintiff's ownership of the stock in suit.

(d) The Randall B Stock transaction: From January 22, 1936, to February 17, 1936, 9,949 shares of Randall B Stock were purchased for plaintiff at a price of $69,-331.76. On January 21, 1936, Bay Newfoundland purchased 8,000 shares for $40,-000. On January 22, 1936, Bay bought 890 shares for $6,702.25. Between February 10 and March 11, 1936, Florence Penick, sister of J. Dabney Penick, bought 1,-965 shares for $17,217.26.

Bay became interested in Randall after two promoters had informed Penick that

---

[12] In support of its view that plaintiff's was a dummy account, they point to a letter from plaintiff to Bay acknowledging receipt of one of the cash liquidating dividend checks of Gas Utilities. Plaintiff wrote: "I have a check from the Gas Utilities Company on the Central Hanover Bank for the staggering sum of $13,-

650.00—What do I do with it? I am terrified something will happen. Do I endorse it? I'd prefer not to put it through the bank here and give St. Louis inflated ideas of the Dunns. Shall I send it to you? I'll keep it wadded up in an old shoe until I hear from you."

two blocks of stock were available—6,100 shares held by the Chase Bank and 8,000 held by Hutton & Co. After Penick made an analysis, Bay decided to go into the deal. He advanced the purchase price for Florence Penick and guaranteed her against loss. The plan was to build a large block of stock in order to interest a distributor. It is clear that Bay wished to reward Penick for his past services, but the latter refused to participate as he was a customer's man and did not think it "ethical" to receive such gratuities from Bay. His sister was, therefore, to be the recipient of Bay's largess. It was determined that one-half the purchase from Chase National—3,050 shares—would be turned over to Florence Penick.

Defendant points out that 3,050 shares from plaintiff's account were sold to Florence Penick on October 26, 1936, at $8.50 per share, when the stock was selling on the Cincinnati Stock Exchange between 10⅝ and 10½. Thus, defendant asks why did Bay sell Mrs. Dunn's stock to Florence Penick? This shows, defendant says, that the securities in the account were regarded by Bay as his own, and demonstrates that he was at all times the beneficial owner of all securities in the account in that, in this instance, he dealt with plaintiff's shares in order to pay off what he considered to be an obligation owing to Penick. This is, indeed, strong evidence in support of defendant's charges; but, it must not be overlooked that plaintiff as a member of Bay's inner circle was also obligated to Penick. He had worked on her account in the past and she was under obligation to him not only with respect to the study and analysis he had made on her behalf in this particular deal, but also in connection with her purchase of the Wilson & Co. shares. The Randall deal brought a profit of 50 cents a share to Mrs. Dunn. The story developed by the Randall situation leaves me still unconvinced that plaintiff is not the owner of the shares in suit.

(e) Associated Gas & Electric transaction: On December 29, 1938, Bay sold to plaintiff's account 4,140 shares of Associated Gas & Electric A Stock. He took a loss of $13,107.71, reported it, and the item was allowed on his income tax return. The sale was made at market on the New York Stock Exchange. Plaintiff gave the stock to her mother when she closed out her account.

The evidence about this transaction is obviously of no support to defendant's position.

The remaining circumstantial evidence upon which defendant relies does not call for critical examination. Defendant shows that plaintiff paid a low interest charge on her debit account. There was no fixed policy on interest charges made by Kidder & Co.; it depended on the desirability of each account. Unquestionably, Bay's importance in the trade was responsible for plaintiff enjoying a low interest charge.

Moreover, defendant's argument that plaintiff's failure to pay personal property taxes in St. Louis, Missouri, is inconsistent with her ownership of the securities found from time to time in the account, has little pertinency. On February 27, 1942, defendant filed a motion under Rule 34 for the inspection of her income tax returns. I denied the motion on the ground that there was no showing of cause why such production should be had and, at that time, I pointed out that there was no supporting affidavit demonstrating materiality and relevancy. At no time before or during the trial did defendant again seek this information. The arguments of counsel with respect to the Missouri tax returns are therefore impertinent.

I am unable to reach the conclusion that plaintiff has no cause of action based upon inferences that in maintaining her brokerage account Mrs. Dunn was no more than a nominee, and that, at all times, Bay was the beneficial owner of the securities in that account. Any other conclusion cannot rationally be reached in view of the fact that, when the account was finally closed, plaintiff retained her 500 shares of Class A Stock of defendant, and gave the remaining securities to her mother and sister. If Bay used the account as a dumping ground or way station to dodge taxes, then it cost him a pretty penny.

V. *Plaintiff was not injured or damaged by the plan of recapitalization.* The defendant argues that plaintiff benefited financially as a result of the revision in capital structure, and persuasive statistical data are presented in support of this argument. From this, defendant urges that since there is no financial loss there can be no damage to the plaintiff. This argument falls wide of the mark. The plan

has been judicially determined to be illegal and of no effect as to dissenting stockholders. Keller v. Wilson & Co., supra. If defendant chooses to carry out an illegal plan, plaintiff's injury is measured not by a guess as to whether she benefited financially, but by her contract with the corporation. Had it not been for the illegal action of defendant, plaintiff, under her contract rights, would have had the chance to benefit financially to a much greater extent than defendant claims she benefits as a result of its illegal action. That such a possibility to benefit appears to be remote is of no consequence, and this is especially so here since the action depriving the plaintiff of this possibility was illegal. I hold that plaintiff's contract rights were violated and that she suffered an injury cognizable in a court of equity.

▇ VI. *The decree dismissing the bill of complaint in Sapperstein v. Wilson & Co., 21 Del.Ch. 139, 182 A. 18, requires a dismissal of this suit under the doctrine of res judicata.* Defendant argues that the Sapperstein suit, which was instituted prior to this action, was a class suit, and that the decree so entered binds all other stockholders similarly situated. The Court of Chancery rejected this argument in Bay Newfoundland Co. v. Wilson & Co., Inc., 11 A.2d 278, and even if I thought that decision erroneous, I am bound by it under Erie R. Co. v. Tompkins, supra, until it is reversed or a different rule is enunciated by the Supreme Court of Delaware. Fidelity Union Trust Co. v. Field, 311 U.S. 169, 177, 61 S.Ct. 176, 85 L.Ed. 109; Six Companies v. Joint Highway Dist., 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114.

My conclusions of law may be stated like this:

1. Plaintiff is the real party in interest.

2. Her rights as an owner of Class A Stock of defendant are determined by Keller v. Wilson & Co., 21 Del.Ch. 391, 190 A. 115.

3. Plaintiff is not guilty of laches.

4. She is not estopped from attacking the amendment to defendant's charter.

5. Plaintiff's right of action is not barred by Sapperstein v. Wilson & Co., 21 Del. Ch. 139, 182 A. 18.

A decree in plaintiff's favor may be submitted.