## METAXA *v.* COUTROS ET AL.

[No. 66, October Term, 1956.]

*Decided January 7, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*A. Freeborn Brown* and *George V. Parkhurst,* with whom was *William J. O'Donnell* on the brief, for appellant.

*J. Wilmer Cronin,* for appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree dismissing a bill of complaint,

"except that portion in reference to the appointment of a receiver, the sale of the partnership assets, the distribution of the proceeds thereof and the dissolution of the partnership". The bill of complaint, filed by one of the partners in a restaurant business known as "Uncle Sam's Restaurant", in Aberdeen, Maryland, had not only prayed the appointment of a receiver but also that the chancellor "award to your Orator such monies as may be disclosed to be due him as his share in the partnership profits from the time of the inception of said Partnership until its dissolution through Receivership and Sale." The appellees in their answer consented to the appointment of a receiver and the sale and winding up of the business. The appellant contends that the court erred in refusing to order an accounting of his share in the partnership profits for the period prior to the appointment of the receiver.

It is conceded that the appellant became a partner in the enterprise on May 12, 1952, on which date an "agreement of sale" was executed by the appellant, Theodore P. Coutros and Samuel Nickas. The parties were all Greeks, and Nickas could not read or speak English. The appellant took the place of a retiring partner, Thomas Abraham, who had been bought out by Nickas. Although the appellant was born in Greece, he had become a United States citizen and served in the United States Army. He had a wife and three children. He received a disability pension from the Government of $50 a month. Under the agreement he was to receive a one-third interest in the business, for which he paid $2,000 in cash and $9,000 in notes payable monthly at the rate of $300, plus interest at 4%. It is admitted that the notes were paid out of his share of the profits. Nickas owned the building in which the restaurant was located. There were two stores in the building and a poolroom on the second floor. The restaurant leased a part of the ground floor at $300 per month. The appellant worked as bartender, alternating with Coutros' son, Constantine Nicholas, who acted as manager of the business, since he could read and speak English more fluently than his father. Constantine was paid $35 a week. The elder Coutros was present every day, and also Nickas, except during an extended visit to Greece. There were six or seven employees,

some of whom occupied rooms over the restaurant. Nickas and Coutros, and his son also occupied rooms in the building.

There were two cash registers in the restaurant. Receipted bills were kept alongside one of them. The appellant testified, the other partners denied, that he was not permitted to check the daily receipts. Constantine Coutros testified he and Metaxa checked the registers alternately. Once a month a Mr. Chenaris came in to post the books. He testified that the appellant would often present him with a bundle of slips, showing daily receipts and disbursements over the previous month, sometimes Coutros would give him the slips, sometimes they would both be present. The appellant testified, Chenaris denied, that Chenaris would not let him see the books. Chenaris testified that shortly after Metaxa joined the partnership there was an agreement between Metaxa and Theodore Coutros that not all of the receipts should be posted in the books. They agreed not to report the total for income tax purposes until after their notes to Nickas were paid. The correct figures, showing what the partners had withdrawn, would be in the upper right hand corner of each slip. This was referred to in the testimony as "under the table" money. Nickas was away when this plan was devised, and he objected when he returned, but the plan was continued. Nickas testified each partner had a drawing account of $50 a week, which was deducted before profits were figured. Coutros and his son both testified, Metaxa denied, that Metaxa got his full share of the profits, less the amount drawn at the rate of $50 a week, at the end of each month, in cash. The money not divided was kept in the safe and deposited in a bank account in amounts sufficient to pay certain bills by check at the end of each month. The money divided, but not shown on the books, amounted to about $1,000 a month. The slips were returned to the partners and destroyed. It may well be that this plan was in operation before Metaxa joined the firm, for the receipts shown on the books for the month of April, 1952, were not materially different from the receipts shown for May. The appellees, Nickas and Coutros, after the appellant left the partnership, filed amended partnership income tax returns for eight months in 1952 and for the year 1953, showing an

increase in the net earnings of $1,000 per month. They also filed amended personal returns, but Metaxa did not.

Metaxa testified that he left the restaurant, in January, 1955, after he learned that Coutros had given a check on partnership funds in payment of an item of $104 for "repairs upstairs". It was shown that this was for installing a meter in the poolroom. Metaxa claimed that he then learned for the first time that the partnership was paying for the electricity, heat and water of other tenants in the building. The other witnesses testified that Metaxa knew this all along; that there was only one meter, and Metaxa was told about the arrangement when he joined the partnership. This was taken into account when the rent paid by the partnership to Nickas was fixed. Thomas Abraham testified that was the understanding when he was a partner, and that Metaxa was told about it. Metaxa testified he then began to check the receipts in the cash registers, and discovered that more money was coming in than the share he had received would indicate. After a heated argument, he left on January 17, and consulted a lawyer. Several witnesses for the appellees testified he left because Nickas would not lend him $5,000 to buy a house.

The appellant produced a witness, Mr. Peter J. Fennia, a certified public accountant, who testified he had made an examination of the partnership books and records, but not an audit, for the period from May, 1952 to December, 1954. Based on purchases of beer to the extent of some $123,000 and food of some $36,000, estimating a mark-up of 100% and disallowing an estimated proportion of the expenses paid on account of other tenants, he calculated that there was an understatement of the partnership income of some $61,000, not shown in the records, although the amounts reported on the original partnership returns were consistent with the partnership books. The gross receipts for the period were about $253,000.

It is well settled that upon the dissolution of a partnership by the withdrawal of one partner, there is a right to an account of his interest. Code (1951), Art. 73A, secs. 29, 43; *Mervis v. Duke*, 175 Md. 300, 306. But it does not follow that an accounting must be decreed where it will serve no use-

ful purpose, or it is shown that there are no profits unaccounted for. The chancellor stated in his opinion that the testimony offered on behalf of the complainant was "too vague, indefinite and unconvincing to justify an accounting in this case." He also found that the testimony of the respondents and their witnesses was clear and convincing. Evidently the chancellor did not believe that the complainant was unaware of the total receipts recorded in the cash registers, or that he did not receive his full share of the net receipts. Metaxa reported income of $4,200 for 1952 and $5,400 for 1953, yet he paid off notes for $300 plus interest per month during those periods, and drew $50 a week besides, which presumably paid for the support of his family. In regard to the slips, Metaxa testified that they showed "I got one-third of the profit", and he received it in cash at the end of each month. He drew $50 each week, and more at the end of each month. He was then asked: "What is your objection now, if you got one-third of the profits each month,—on what do you base your claim?" He replied: "The expenses,—this money was not put in mine. Q. What expenses? A. The electrical bill and the expenses that were put in there. I did not know these bills were charged to the partnership. Q. You started there in May, 1952? A. Yes, sir. Q. And all of these bills were paid in 1952, 1953 and 1954? A. Yes, — I imagine they were." He "knew that we had one bill for the electricity, but I did not know that we were getting billed for everything in the neighborhood." He also admitted that daily receipts and daily expenses were entered in a book kept in "the drawer". He knew what was in the book.

As the appellees point out in their brief, the witness Fennia's testimony can be reconciled with their estimate of $1,000 a month understatement of profits. He added to the receipts reported, estimates of income from music boxes, cigarette and pinball machines, telephone, etc., which Coutros testified had been entered on the adding machine tape. It was admitted that all the partners and employees ate their meals in the restaurant without charge. Some of the food was thrown out. Mr. Demas, who operated the restaurant for the receiver, testified that the net profits would not amount to more than 10%

of the gross receipts. Mr. Abraham testified the net profits when he was a partner varied from 10% to 15% before taxes. But regardless of whether the appellees' estimate was correct or not, the chancellor found as a fact that Metaxa received one-third of the profits. All of the books and records in existence were in court, and had been examined before trial by his lawyers and accountant. If Metaxa had received his full share, there was nothing more to account for. We think the issue is one of veracity, in which the finding of the chancellor should not be disturbed. On the record in this case we cannot find that he was clearly wrong.

In view of our conclusion on this point it is unnecessary to consider the question whether the complainant should be denied an accounting because of participation in an apparent attempt to defraud the Government of income taxes, or delay their payment. See *Reinstine v. Rosenfield,* 111 F. 2d 892 (C. C. A. 7th) and Note 32 *A. L. R.* 2d 1397.

*Decree affirmed, with costs.*