**PATTERSON–SCHWARTZ & ASSOCIATES, INC., a corporation of the State of Delaware, Plaintiff,**

**v.**

**UNIT, INC., a corporation of the State of Texas, Defendant.**

**Civ. A. No. 74–130.**

United States District Court,
D. Delaware.

April 30, 1975.

Vincent A. Theisen and Steven D. Goldberg of Theisen, Lank & Mulford, Wilmington, Del., for plaintiff.

Daniel M. Kristol of Killoran & Van Brunt, Wilmington, Del., for defendant.

STAPLETON, District Judge:

## FINDINGS OF FACT

1. Plaintiff Patterson-Schwartz & Associates, Inc. ("Patterson-Schwartz") is a Delaware corporation having its principal place of business in Delaware.

2. Defendant Unit, Inc. ("Unit") is a Texas corporation whose principal place of business is not in Delaware. It is registered to do business in Delaware and has real estate investment interests in Wilmington, Delaware; Cincinnati, Fairmont and Columbus, Ohio; Lexington, Kentucky; Las Vegas, Nevada; and Dallas, Texas.

3. The amount alleged to be owed Patterson-Schwartz by Unit, exclusive of interests and costs, exceeds $10,000.

4. On May 29, 1969 Patterson-Schwartz and Unit entered into a general partnership agreement ("the Agreement"), a copy of which is attached and incorporated herein. As set forth in the Agreement, the purpose of the partnership—the name of which was the Pennsylvania Avenue Property Company ("PAPC")—was to "engage in the busi-

ness of acquiring and holding for investment [certain real property]" and "to build [on the acquired real property] an apartment project or other commercial buildings."

5. On the day the Agreement was executed, the partnership borrowed $325,000 from the Bank of Delaware. The partners executed a "corporate note"[1] rendering themselves jointly and severally liable for repayment of the loan. Shortly thereafter the principal was reduced to $301,000 by repayment of funds received from the bank as a part of the loan.[2]

6. The proceeds of the bank loan, together with $15,600 advanced in equal shares by Patterson-Schwartz and Unit,[3] were used to purchase lots in the City of Wilmington in a block bounded by Rodney and Broom Streets and Pennsylvania Avenue. These lots were then mortgaged to secure the debt to the bank. Located on the acquired properties were residential dwellings which the partnership intended to rent until their removal would be made necessary by the advent of the contemplated construction project.

7. Although the partnership agreement provided that Patterson-Schwartz and Unit were to be "co-managing partners of the partnership business," it was tacitly understood that Patterson-Schwartz, being the partner located near the partnership property, would manage the properties and maintain the accounts. Rental income was insufficient to meet interest and other expenses, and in November of 1969, Patterson-Schwartz billed Unit for its share (i. e. 50%) of the deficiencies which Patterson-Schwartz had paid on behalf of the partnership. In the beginning of December, Unit made a $4,949.65 disbursement to Patterson-Schwartz to cover this bill.

8. On December 10, 1969, the partnership received some adverse news. Despite a favorable recommendation by the Wilmington Planning Director, the City Planning Commission rejected the partnership's application for rezoning of the partnership land to permit inclusion of commercial units within the envisioned project. Harry Tingle, the Vice-President of Patterson-Schwartz, advised B. W. Morris, the President of Unit, of this development and further wrote:

> Our next step is before City Council, but I can't predict the outcome. However, we expect to go ahead with a condominium apartment project regardless, which requires no change in the present status of the property.

> I am quite hopeful that we can bail you out with a profit on the land unless you feel you would like to stay in the deal. Response from the publicity has been great. . . .[4]

The inference to be drawn from this letter—an inference confirmed by testimony of the witness—is that Unit had no enthusiasm for going forward with a strictly residential project.

9. Accordingly, shortly after the rezoning fell through, Patterson-Schwartz and Unit reached an understanding that Patterson-Schwartz would try to interest third parties in the partnership property. Over the subsequent years, Patterson-Schwartz made a number of unsuccessful efforts toward this end. These efforts involved solicitation of proposals either to take over the entire project or to join with Patterson-Schwartz in some kind of joint venture to carry the project forward.

---

1. PX-5.

2. PX-4.

3. The partnership agreement provided that "the original capital of the partnership shall consist of $_____ cash, contributed by the partners in proportion to their respective interests in profits or losses as set forth hereinbelow" and "the net profits or net losses of the partnership shall be credited or charged as the case may be to the partners in the following ratios:

| | |
|---|---|
| Patterson-Schwartz & Associates, Inc. | 50% |
| Unit, Inc. | 50%" |

4. Letter, H. B. Tingle to B. W. Morris, PX-6.

10. In the Spring of 1972, there were discussions between Tingle and Unit's counsel, Marvin Lewis, regarding the possible sale of Unit's interest in the partnership to Patterson-Schwartz or to a third party. During a phone conversation, Tingle suggested to Lewis that the latter discuss with his principals the terms on which Unit would be willing to sell out. Lewis testified at trial that an agreement for the acquisition of Unit's interest was reached during this conversation, but the subsequent correspondence between the parties does not bear this out. On April 19, 1972, Lewis wrote to Tingle, stating:

I have discussed the matter of Unit's participation in the Pennsylvania Avenue Property with Mr. B. W. Morris and it is agreeable with him and Unit, Inc. that you or a proposed purchaser that you might have purchase Unit's interest in the Pennsylvania Avenue Property and we will join in the deed upon payment or settlement with Unit, Inc. of all the monies that Unit, Inc. has invested in the property and for a complete release of any indebtedness Unit might have with your company or the bank.

If this is agreeable with you, please let me hear from you at the earliest possible moment as to when this transaction can be closed.[5]

11. The following day, Lewis again wrote Tingle—this time to specify the exact amount of cash which—together with a release of all indebtedness to the bank and Patterson-Schwartz, would be necessary to acquire Unit's interest.[6]

12. On May 25, 1972, Tingle returned Lewis' letter, indicating that:

I am taking the entire matter up with our other principals and I think that maybe the best way to handle this matter would be for you and Bill to execute the quit-claim deed in favor of Patterson-Schwartz & Associates, Inc. and forward the same to Jack Killoran[7] with instructions to deliver the same, in the event that Patterson-Schwartz & Associates, Inc. agree to pay the Unit investment.[8]

13. The requested deed was not forwarded, however, and on July 28, 1972, Patterson-Schwartz's attorney, Vincent A. Theisen, stepped into the picture. He wrote Lewis:

. . . I now have been requested by Patterson-Schwartz & Associates, Inc. to lend a hand in bringing to a conclusion the Pennsylvania Avenue joint venture about which you wrote Harry Tingle on April 20, 1972. As I understand it, there is the sum of $13,434.65 due you as a result of the forwarding payment of interest, accounting and legal and travel expenses. I am advised by Patterson-Schwartz & Associates, Inc. that there has been a considerable amount of difficulty in communications and that although Harry Tingle had suggested that you prepare a quit-claim deed and send it to Jack Killoran, who represents you in this matter, nothing has been done. Actually, I think Tingle's suggestion was completely wrong inasmuch as I doubt that a Texas lawyer should prepare a deed for property located in Wilmington. I, therefore, have taken the matter into my own hands and have prepared the enclosed deed for your consideration. May I suggest that if you want to close out this matter, which obviously has been costly and expensive to you as well as Patterson-Schwartz, that you execute the deed and send it to Killoran with instructions as to the conditions under which he may release it to me or to Patterson-Schwartz. I would personally appreciate it if you would give this your prompt attention as the mat-

5. Letter, Tingle to Lewis, DX-1.

6. Letter, Lewis to Tingle, DX-2.

7. Mr. Killoran served as Unit's Delaware local counsel.

8. Letter, Tingle to Lewis, DX-3.

ter is one in which neither party is happy and should be terminated.[9]

14. The deed referred to and enclosed with Theisen's letter was never executed and forwarded and on August 7, 1972 and August 22, 1972, Theisen wrote again to Lewis:[10]

In my letter of July 28, I enclosed a deed, which was a joint one, in blank. . . . I would think that you would be well protected if you would sign the deed and send it to Mr. Killoran with instructions as to the circumstances under which you would agree to its deliverance to either me as the representative of Patterson-Schwartz or directly to Patterson-Schwartz. This would certainly bring the payment to you of the $14,434.65 which I assume would go a long way to offsetting the fee which I had previously charged in the Unit Inc. litigation. . . .

\* \* \* \* \* \*

. . . Why not send me the deed with the understanding that it will be held by me as Escrow Agent for you until I receive from Patterson-Schwartz & Associates, Inc. the sum of $14,434.65 which you claim represents interest, accounting, legal and travel expenses involved in the venture. If and when I receive the deed and payment from P & S, I will have P & S execute a mutual release and will forward the same to you together with your check and will deliver the deed in anticipation that you will sign and return one copy of the mutual release which will, of course, be a condition precedent to the acceptance by you of the sum of money which I will send. In this way, we can at least get the matter in a position where it can be settled expeditiously, a matter in which I believe everyone would benefit from.

15. For whatever reason, the requested deed was never forwarded and Patterson-Schwartz ceased pursuing the matter. There is no evidence that the Bank of Delaware ever agreed to release Unit from its obligation on the note or that it was ever asked to consider doing so.

16. During the period before and after these abortive negotiations in 1972, and during the entire time that Patterson-Schwartz has attempted to obtain a buyer for the partnership property, Patterson-Schwartz has continued to advance the funds necessary to meet the operating deficits of the partnership. Other than the $4,949.65 payment of early December, 1969, Unit has made no contribution toward these expenses.

17. On May 31, 1974, Patterson-Schwartz made written demand upon Unit to pay $57,413.59 which, according to Patterson-Schwartz's records, was the amount then owing as Unit's share of the monies advanced by Patterson-Schwartz on behalf of the partnership since Unit's sole payment in December of 1969. While the record reveals no prior formal demand, statements of the income and expenses of the partnership had been furnished to Unit on an annual basis. In addition, there were other communications between the parties reflecting partnership affairs. Unit sent a partnership federal income tax return to Patterson-Schwartz for 1969 which had been prepared by Unit's accounting firm, Ernst & Ernst. Then, for each year from 1970 to 1973, Patterson-Schwartz sent Unit copies of the partnership's federal income tax return as prepared by a Delaware accounting firm based on information supplied by Patterson-Schwartz. Unit consistently entered its 50% share of partnership losses on its own corporate federal income tax returns up to and including its return for the fiscal year April 1, 1973 to March 31, 1974.[11]

18. All of the partnership tax returns contained balance sheet data in-

9. Letter, Theisen to Lewis, DX-5.

10. Letters, Theisen to Lewis, DX-6 and 7.

11. See corporate income tax returns, DX-8A, 8B and 8C.

cluding the amount of each partner's capital account at the beginning and end of the calendar year. This data shows that 50% of the losses of the partnership were charged against the capital accounts of each partner.[12] On the tax returns, the amounts being advanced by Patterson-Schwartz to meet partnership obligations were being treated as "Accounts payable to partners." The audit sheets for 1970–73, admitted in evidence along with the tax returns, recorded the total amounts of accounts payable to partners as half owing to Patterson-Schwartz and half owing to Unit. These sheets thus treat the payments of Patterson-Schwartz on behalf of the partnership as loans to the partnership, fifty percent of which were made by Patterson-Schwartz on behalf of Unit. There is no evidence of record, however, that these audit sheets were supplied to Unit along with the partnership tax returns.

19. This suit was instituted on June 28, 1974.

20. On or about August 8, 1974, Unit wrote to Patterson-Schwartz as follows:

This is to advise that pursuant to the provisions of the above partnership agreement dated May 29, 1969

. . .

Unit, Inc. does hereby elect to retire from the aforesaid partnership with the result that the partnership shall be dissolved, the partnership business wound up and all properties be distributed in liquidation. . . .

21. Unit's Answer in this case contained a counterclaim which sought specific performance of an alleged 1972 agreement of Patterson-Schwartz to purchase Unit's interest in the partnership and, in the alternative, a court-supervised winding-up and liquidation of the partnership.

22. During the period from 1969 to the present, while Patterson-Schwartz has maintained separate records reflecting partnership income and expenses and has caused those records to be annually audited, it has deposited partnership income in, and has made disbursement on behalf of the partnership from, its own corporate checking account. In this sense, Patterson-Schwartz, to the extent of the rental payments received, may be said to have commingled partnership funds with its own.

23. After the plan for a tower building containing commercial units was abandoned for want of a zoning variance and while efforts were being made to interest third parties, Patterson-Schwartz developed plans for a twin-tower structure. The purpose of this development was to have a proposal which could be used to interest third parties.

24. While the twin-tower structure could have been accommodated on the partnership property with expensive underground parking, the plan as actually developed contemplated ground level parking which would require utilization of more land than that then owned by the partnership. Accordingly, Patterson-Schwartz acquired options in its own name to purchase two adjacent lots. Unit was not informed of the acquisition of these options.

25. In early 1974, Patterson-Schwartz, without advising Unit, applied in the name of the partnership for a zoning variance which would facilitate constructions of its alternative plan. In September of 1974, Patterson-Schwartz, without advising Unit, secured a commitment in principal for long term financing for development of its alternative plan. These steps were taken in furtherance of Patterson-Schwartz's attempt to develop a viable proposal which could be used to interest third parties.

26. Patterson-Schwartz's failure to inform Unit of the options, its variance application, and the negotiations for financing of its alternative plan was attributable to the fact that Unit lacked

12. As of December 31, 1973 each partner had a deficit capital account of $97,613.04.

This figure included losses from depreciation of partnership assets.

interest in going forward on that plan and that Patterson-Schwartz contemplated that any arrangements to go forward with the plan would have as a prelude a purchase of Unit's interest. There is no evidence that Patterson-Schwartz made any affirmative effort to conceal any of its activities or plans from Unit.

27. Patterson-Schwartz submitted at trial a summary statement of Unit's share of partnership income and expenses for the years 1969–1974 and made its supporting records available for Unit's inspection. This summary showed that as of December 31, 1974, Unit's unpaid share of partnership expenses was $73,927.35. While the Court would expect on the basis of the record that this amount approximates Unit's share of those expenses, the Court, based on the cross-examination regarding the statement, is not convinced that it is a wholly accurate reflection of Patterson-Schwartz's disbursements and, therefore, of Unit's obligation, for the period in question. While the Court might be able to determine Unit's obligation with reasonable certainty through an analysis of this summary, the conclusion reached by the Court renders this task unnecessary.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this suit pursuant to 28 U.S.C. § 1332(a)(1).

2. A binding partnership agreement was entered into by Patterson-Schwartz and Unit on May 29, 1969.

■ 3. The negotiations between Patterson-Schwartz and Unit in the Spring of 1972 did not, as Unit contends, result in a binding bilateral contract under which Patterson-Schwartz had a duty to purchase the Unit partnership interest. Tingle's letter of May 25, 1972 indicates that he was still pursuing the matter with his other "principals" and was proposing the execution of a quit-claim deed to go into escrow as a mechanic by which the deal could be fa-cilitated in the event an agreement were reached. Attorney Theisen's letters in the Summer of 1972, while clearly reflecting a continued interest on the part of Patterson-Schwartz, do not constitute an acceptance of a definite pre-existing offer of Unit. Theisen was merely pursuing the earlier suggestion of Tingle that a deed be placed in escrow with Unit's Delaware attorney "with instructions as to the conditions under which he may release it." Thus Unit remained a member of the partnership at the time this suit was filed and had no enforceable contract for the sale of its interest in the partnership.

■ 4. Even assuming, however, that Unit were correct in its contention that a bilateral contract had at one time existed between Unit and Patterson-Schwartz, this would not alter what the Court has found to be the legal relationship between the parties at the time suit was filed. Such a bilateral contract, in Restatement terminology, would have consisted of promises for an agreed exchange.[13] Patterson-Schwartz would not have had an immediate duty of performance until Unit tendered its quit-claim deed. Moreover, in the context in which the parties dealt, this condition precedent to Patterson-Schwartz's duty would have included an implied condition that Unit tender performance within a reasonable time. Depending upon whether Unit's obligation to pay its share of partnership expenses be considered as one running to Patterson-Schwartz or to the partnership, as time passed either the value of the release to be provided by Patterson-Schwartz was continually increasing or the value of the partnership interest to be conveyed by Unit was continually decreasing. Because of this fact, which was known to both parties, the duty to tender which Unit would have had under the alleged bilateral contract would have been breached long before this suit was instituted. This breach would have discharged the duty of Patterson-Schwartz

---

13. Restatement, Contracts § 266.

and left the contract unenforceable against it. 6 Corbin, *Contracts* § 1252 (1962); Restatement, *Contracts*, §§ 274, 276.[14]

5. Lewis, Unit's general counsel, conceded at trial that Unit would be liable *for its share of the amounts expended* by Patterson-Schwartz on behalf of the partnership if no contract had been made in 1972. He conceded, for example, that the $4,949.65 paid by Unit in December of 1969 was to satisfy a legal obligation and that Unit was responsible for its share of other expenditures made prior to the alleged 1972 agreement.[15]

Unit's second line of defense, however, is that any obligation it may have is to the partnership and that Patterson-Schwartz cannot recover a judgment against Unit, absent an accounting and liquidation of the partnership assets. Patterson-Schwartz, on the other hand, maintains that it, in effect, advanced funds to the partnership on Unit's behalf and that Unit, accordingly, has a direct obligation to it rather than the partnership. Under the present state of facts, however, the result is the same whether Unit's view of the law or that of Patterson-Schwartz be accepted.

■ 6. Under the terms of the Agreement, Unit's letter of August 8, 1974 dissolved the partnership thirty days after its receipt on August 9, 1974. As a result, it is now appropriate that the partnership business be wound up, the partnership's obligations satisfied, and the accounts between the partners adjusted.[16]

7. In their partnership agreement, the parties provided that the laws of Texas—specifically, the Texas Uniform Partnership Act—would govern their mutual relations, except to the extent that such laws were inconsistent with the provisions of the partnership agreement. Section 18 of the Texas Uniform Partnership Act provides in part:

(1) The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(a) Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property, and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits.

(b) The partnership must indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the preservation of its business or property.

(c) A partner, who in aid of the partnership makes any payment or advance beyond the amount of capital which he agreed to contribute, shall be paid interest from the date of the payment or advance.

Section 40 of the same Act, provides, in part:

§ 40. *Rules for Distribution.*

In settling accounts between the partners after dissolution, the following rules shall be observed subject to any agreement to the contrary:

(a) The assets of the partnership are:

(I) The partnership property,

---

14. If the Theisen letters be construed as an offer for a unilateral contract, a similar analysis would lead to the conclusion that the offer terminated without an acceptance long before the filing of this action. Restatement, *Contracts* § 40.

15. T. 183–85.

16. See Texas Uniform Partnership Act, 17 Vernon's Tex.Civ.Stat. Art. 6132b [hereinafter "Texas Uniform Partnership Act"], §§ 30, 40; *Heathington v. Heathington Lumber Co.*, 420 S.W.2d 252 (Tex.Civ.App.1967); *cf. Metaxa v. Coutros*, 211 Md. 499, 128 A.2d 273 (1957).

(II) *The contributions of the partners necessary for the payment of all the liabilities in clause (b) of this paragraph.*

(b) The liabilities of the partnership shall rank in order of payment, as follows:

(I) Those owing to creditors other than partners,

(II) *Those owing to partners other than for capital and profits,*

(III) Those owing to partners in respect of capital.

(IV) Those owing to partners in respect of profits.

(c) The assets shall be applied in the order of their declaration in clause (a) of this paragraph to the satisfaction of the liabilities.

(d) The partners shall contribute, as provided by Section 18(a) the amount necessary to satisfy the liabilities . . .. (Emphasis supplied)

■ The statutory scheme is thus one in which advances by one partner for partnership expenses become an obligation of the partnership and, *ipso facto* of the non-paying partner, in any case where, upon dissolution, assets of the partnership are insufficient to meet this "partnership obligation." This is the interpretation put upon the statutory language in the comments to Section 40:

[Section 40] lays down comprehensive rules for the distribution of partnership assets after dissolution. . . .

Paragraph (a) includes as partnership assets the contributions from the partners necessary to meet partnership liabilities.

. . . Subparagraph (2) [of paragraph (b)] includes loans by partners and rights of contribution under § 18(1)(b).

\* \* \* \* \* \*

Paragraph (d) links § 18(1)(b) (which provides for contributions to indemnify a partner who pays or incurs more than his personal share of partnership liabilities) and Paragraph (a)(II) (which treats rights of contribution as partnership assets).[17]

8. The Texas Uniform Partnership Act would thus contemplate that, in a situation of this kind, the settlement of accounts between the partners would involve the payment by Unit of the amount necessary, after exhaustion of "the partnership property" as that term is used in Section 40(a)(I), to reimburse Patterson-Schwartz for Unit's share of the advances made by Patterson-Schwartz, and interest thereon from the dates of payment. The Partnership Agreement must be examined, however, in order to determine whether and to what extent the parties agreed to modify the statutory scheme.

9. The Partnership Agreement provides, in part:

The original capital of the partnership shall consist of \$_____, cash, contributed by the partners in proportion to their respective interests in profits or losses as set forth hereinbelow. An individual Capital Account shall be maintained for each partner at all times in the proportion of its interest in profits or losses of the partnership.

An individual Drawing Account shall be maintained for each partner and all withdrawals shall be charged thereto. Each partner's share of any partnership net loss shall be charged to its Drawing Account, and its share of partnership net profits shall be credited to its Drawing Account. A credit balance in a partner's Drawing Account shall constitute a liability of the partnership to that partner; it shall not constitute a part of that partner's interest in the capital of the partnership. A debit balance in a partner's drawing account, whether occasioned by drawings in excess of its share of partnership profits or by charging it for its share of partnership losses, shall constitute an obliga-

17. 17 Vernon's Tex.Civ.Stat. Art. 6132b § 40, comments (1970).

tion of that partner to the partnership and shall not reduce its interest in the capital of the partnership.

\*   \*   \*   \*   \*   \*

. . . The proceeds from liquidation of the partnership as such shall be applied in the order of priority as follows:

1. Debts of the partnership, other than to partners; provided, however, that in the case of mortgage debt secured by property of the partnership, undivided interests in such property in the proportions of the partners' interest in the profits or losses shall be distributed in kind to the partners and each of such partners shall be severally liable (as among each other) for its proportionate part of the mortgage debt which need not be paid or otherwise discharged out of the proceeds of liquidation.

2. Amounts owed to partners, if any, for the credit balances in their respective Drawing Accounts on a pro rata basis.

3. The capital contributions of the partners as reflected in their respective Capital Accounts on a pro rata basis.

Any gain or loss on disposition of partnership assets in the process of liquidation shall be credited or charged to the respective partners in the proportion of their interests in profits or losses. Should any partner have a debit balance in its Capital Account, whether by reason of losses in liquidating partnership assets or otherwise, said debit balance shall represent an obligation from it to the other partners.

■ 10. First, it is apparent from the quoted provisions of the Agreement that the parties agreed to special treatment of mortgaged property in the event of dissolution. Such property was to be distributed in kind with each partner receiving an undivided one-half interest therein with an undertaking (as between the two partners) to pay one-half of the liability on the note and mortgage. The remaining assets were then to be liquidated, the liabilities of the partnership paid, and any remaining funds distributed to the partners in accordance with the statute and the Agreement.

11. The other provisions of the Agreement do not expressly provide for the payment upon dissolution of accounts payable to a partner as a result of his advances on behalf of the partnership. It is sufficient for present purposes, however, to hold that the Agreement as a whole evidences no intention that the statutory scheme providing for contributions from the other partner to cover such partnership debts be modified. It should also be added that if the Agreement were construed to evidence such an intent, it would not be controlling given the background of the relationship between the parties. As previously noted they apparently did not fully implement the portions of the partnership agreement which specify the method of keeping the partnership accounts, and the financial data which was circulated between them treated Patterson-Schwartz's advances as a liability of the partnership. Under these circumstances, Unit, which knew that it was not advancing funds to meet current expenses, must have understood that it would be called upon at some point to pay its share of this partnership liability.

■ 12. The Court concludes (1) that the partnership is dissolved, (2) that the mortgaged properties should be distributed in kind (which would appear to require no further action since these properties are currently held under deeds conveying an undivided one-half interest to each partner), (3) that Patterson-Schwartz should, within thirty days, prepare and file an accounting which will reflect a liability of Unit in such amount as may be necessary to provide reimbursement to Patterson-Schwartz of the funds it has advanced on behalf of the partnership, with interest from the respective dates of payment

at the rate of 6 percent,[18] and (4) that, after an opportunity for the determination of any exceptions filed by Unit, a judgment should be entered in favor of Patterson-Schwartz against Unit for the amount necessary to settle the accounts of the partners, with costs.[19]

■ 13. Judgment in favor of Patterson-Schwartz is not barred by the doctrine of unclean hands. That doctrine is not one of absolutes. The purpose of the doctrine is to protect the integrity of the Court[20] and it is not every impropriety of one seeking judicial relief which will cause a court to stay its hand.

■ In order to determine whether the conduct of the plaintiff is such as to bar relief on an otherwise meritorious claim, the Court must examine the intent behind the improper conduct, the extent, if any, of the injury to the defendant or the public arising therefrom, any mitigating circumstances relating to the conduct of the defendant, and the relationship between plaintiff's improper conduct and the claim which he asserts.[21]

■ 14. In this case the conduct alleged to bar Patterson-Schwartz is its commingling of assets and its failure to advise Unit of its activities in connection with its alternative plan. I think it clear from the record that this conduct does not reflect any intention of Patterson-Schwartz either to profit at the expense of Unit or the public and that no damage to Unit or the public was in fact occasioned by it. The activities of Patterson-Schwartz with respect to the alternative plan were intended to accomplish what its partner most wanted—a way out which would return as much as possible of what it had invested. I further think it fair to say that Unit virtually abandoned the partnership after 1969 and was entirely content to let Patterson-Schwartz "carry the ball" in extricating the partners after their initial plan fell through. If Unit had exhibited any interest in the partnership affairs after 1969, I am confident that Patterson-Schwartz would have kept it fully informed. Finally, it is to be noted that the alleged misconduct of Patterson-Schwartz was unrelated to the subject matter of the controversy giving rise to its claim. Patterson-Schwartz seeks reimbursement for advances concededly made in furtherance of the interests of the partnership. None of the alleged improprieties are related in any way to

18. As noted above, Section 18(1)(c) of the Texas Uniform Partnership Act provides for the payment of interest to the partner making advances from the date of payment. A Texas case decided prior to passage of the UPA in Texas allowed interest on such advances at the rate of 6%. *Reese v. Carey Bros.*, 286 S.W. 307, 314 (Tex.Civ.App. 1926). This rate was evidently based on the predecessor statute to Vernon's Tex.Civ. Stat. art. 5069–1.03 (1970) which provides:

When no specified rate of interest is agreed upon by the parties, interest at the rate of 6% per annum shall be allowed on all written contracts ascertaining the sum payable from and after the time when the sum is due and payable; and on all open accounts, from the first day of January after the same are made.

This statute has been held applicable to implied contracts, *Miller v. Guaranty Trust & Banking Co.*, 207 S.W. 642 (Tex.Civ.App. 1919) and has been tacitly conceded to be the interest statute relevant to claims on partnership advances. See, *Cofer v. Hearne*, 459 S.W.2d 877 (Tex.Cr.App.1970). Of course, the date whence interest is assessed is controlled by the Partnership Act since it is the more specific statute on point. The conclusion that Texas law requires payment of interest at the statutory rate from the date of the advance is consistent with the majority rule in other jurisdictions. *See* 60 Am.Jur.2d § 290 (1972); 68 C.J.S. Partnership § 84c (1950).

19. While the Court's analysis has accepted Unit's view of the law, the result would be the same if the view of Patterson-Schwartz were adopted. In the present circumstances, it is appropriate that the obligations of the two parties arising out of their relationship as partners be determined by the equitable remedy of accounting in conjunction with a partnership accounting. The amount determined to be owing by Unit to Patterson-Schwartz should be the same as it would be if the matter were treated solely as a winding up of the partnership.

20. See, *e. g.*, *Dunn v. Wilson & Co.*, 51 F. Supp. 655, 669 (D.Del.1943).

21. See Pomeroy, *Equity Jurisprudence* §§ 398, 399 (1941).

those advances. Under these circumstances, the integrity of the Court does not require that it turn a deaf ear to plaintiff's cause.

Submit order.

## APPENDIX A

### PARTNERSHIP AGREEMENT
### PENNSYLVANIA AVENUE PROPERTY COMPANY

THIS PARTNERSHIP AGREEMENT IS EXECUTED as of the 29th day of May, 1969, by and between PATTERSON-SCHWARTZ & ASSOCIATES, INC. and UNIT, INC., a Texas corporation.

The partnership shall operate under the name of PENNSYLVANIA AVENUE PROPERTY COMPANY and shall engage in the business of acquiring and holding for investment the real property described in Exhibit "A" attached hereto. The partnership shall commence as of the date first above written and shall continue until terminated as hereinafter provided.

The original capital of the partnership shall consist of $——————— cash, contributed by the partners in proportion to their respective interests in profits or losses as set forth hereinbelow. An individual Capital Account shall be maintained for each partner at all times in the proportion of its interest in profits or losses of the partnership.

An individual Drawing Account shall be maintained for each partner and all withdrawals shall be charged thereto. Each partner's share of any partnership net loss shall be charged to its Drawing Account, and its share of partnership net profits shall be credited to its Drawing Account. A credit balance in a partner's Drawing Account shall constitute a liability of the partnership to that partner; it shall not constitute a part of that partner's interest in the capital of the partnership. A debit balance in a partner's drawing account, whether occasioned by drawings in excess of its share of partnership profits or by charging it for its share of partnership losses, shall constitute an obligation of that partner to the partnership and shall not reduce its interest in the capital of the partnership.

The net profits or net losses of the partnership shall be credited or charged as the case may be to the partners in the following ratios:

| | |
|---|---|
| Patterson-Schwartz & Associates, Inc. | 50% |
| Unit, Inc. | 50% |
| Total | 100% |

Patterson-Schwartz & Associates, and Unit, Inc. shall be co-managing partners of the partnership business. Each partner shall devote only a portion of its time to the partnership business, it being expressly understood that each of the partners has other businesses and that each may acquire properties for its own account or jointly with other partners or in other capacities and that property acquired by or standing in the name of one partner or in any name other than the partnership name shall not be deemed partnership property unless an instrument in writing signed by the partner or other person(s) or entity(ies) in whose name the property stands shall so specify. Either of the managing partners may, but none of the other partners shall borrow or lend money on behalf of the partnership or execute any mortgage or lease of partnership property.

No partner, without the consent of the others, shall sell, assign, pledge or mortgage its interest in the partnership.

Any partner may retire from the partnership after giving thirty (30) days written notice to the others of its intention to retire, but the partnership shall be dissolved by the retirement or the death of a partner and the partnership business shall be wound up and all of its properties distributed in liquidation. The partners shall continue to share profits and losses during the period of liquidation in the same proportions as before dissolution, even though such dissolution may be occasioned by the retirement or death of one of the partners. The proceeds from

liquidation of the partnership as such shall be applied in the order of priority as follows:

1. Debts of the partnership, other than to partners; provided, however, that in the case of mortgage debt secured by property of the partnership, undivided interests in such property in the proportions of the partners' interest in the profits or losses shall be distributed in kind to the partners and each of such partners shall be severally liable (as among each other) for its proportionate part of the mortgage debt which need not be paid or otherwise discharged out of the proceeds of liquidation.

2. Amounts owed to partners, if any, for the credit balances in their respective Drawing Accounts on a pro rata basis.

3. The capital contributions of the partners as reflected in their respective Capital Accounts on a pro rata basis.

Any gain or loss on disposition of partnership assets in the process of liquidation shall be credited or charged to the respective partners in the proportion of their interests in profits or losses. Should any partner have a debit balance in its Capital Account, whether by reason of losses in liquidating partnership assets or otherwise, said debit balance shall represent an obligation from it to the other partners.

This Partnership Agreement is entered into in the State of Texas and shall be governed by the laws thereof. Except to the extent the Texas Uniform Partnership Act is inconsistent with the provisions of this Partnership Agreement, the provisions of such Act shall apply to the partnership created hereby.

This Partnership Agreement is subject to the following special terms, conditions, covenants and agreements:

A. The land described on Exhibit A attached hereto has or will be purchased by the partnership in the joint name of the partners.

B. On the land described in Exhibit A, the partners intend to build an apartment project or other commercial buildings. Funds for this project will be provided to the maximum extent possible by long term mortgage loan.

C. Interim financing for purchase of the land has been arranged with the Bank of Delaware, Wilmington, Delaware, in the sum of THREE HUNDRED TWENTY-FIVE THOUSAND ($325.-000.00) DOLLARS, and the loan has been signed by the partners evidencing the partners' indebtedness to the said Bank of Delaware.

It is further agreed that any equity funds required above and beyond the proceeds of the long term loan referred to above and the interim financing referred to above shall be provided jointly by the partners hereof.

This Partnership Agreement shall enure to the benefit of and be binding upon the partners and their successors and assigns.

IN WITNESS WHEREOF, the partners have executed this Partnership Agreement as of the date first above written.

PATTERSON-SCHWARTZ & ASSOCIATES, INC.

By ____/s/____
Vice President

ATTEST:

____/s/____
Secretary

UNIT, INC.

By ____/s/____
President

ATTEST:

____/s/____
Secretary